# SULLIVAN,

## JULY TERM, A. D. 1852.

## COWLES & a. v. KIDDER & a.

Every proprietor of land over or through which a stream of water flows, is, in virtue of such ownership, entitled to the use of the water flowing over it in its natural current, without diminution or obstruction.

It is immaterial whether a proprietor be above or below another in the stream, for no right is affected by any such circumstance.

No proprietor has a right to throw back water upon the premises of a proprietor above, or to divert it from one below.

Where the proprietor of land and a mill privilege erected a dam across the stream upon his own land, and thereby caused the stream to become obstructed with ice, and the water of the stream to be thrown back upon the land and mills of a proprietor above, on the same stream, and the operation of the mills was thereby obstructed, it was *held* that the proprietor below was liable for the damage occasioned by the obstruction.

A parol license to be exercised upon land, is a personal privilege, to be enjoyed by the person to whom it is granted, and creates no interest in the land, and is not assignable, and a conveyance by him who exercises it will confer no right upon another to exercise it.

A license to erect a dam and flow the land of another terminates with the decay of the dam, and gives no right, when the dam has become decayed and ruinous, to reërect or repair it and flow the land again.

Whether the proprietor below, who has erected a dam across the stream upon his own land, be liable or not for accidental injury incident to a reasonable use of his privilege, sustained by the proprietor above in times of freshet or extraordinary ice times, &c., causing damage to him, which damage is the result of accident which could not be foreseen or prevented, and not of any wrongful act of him in the erection of the dam, *quære?*

CASE, for causing the water to flow back upon the plaintiffs' mills, situated on Sugar river, in Claremont, and obstructing the same with back water and ice.

The writ was dated January 9, 1849. Plea, the general issue.

On the trial it appeared that there is an island in said river, called Rock Island; that in low water the largest quantity of water flows on the north side of said island, and in high water the largest quantity of water flows on the south side.

The plaintiffs proved that they were the owners of certain mills, with the privileges appertaining to the same, called the Dexter Mills; that these mills were built on the north side of said island, near the upper end of it, and the west line of the plaintiffs' land appeared to be several rods below the mills. For more than twenty years prior to 1836, said mills had been used by the plaintiffs' grantors, they having the title to them without interruption. In 1836 the defendants' dam was erected, about fifteen rods below said mills; and in May, 1848, they became the purchasers of them; connected with which was a cabinet shop and machinery therein.

In December, 1848, the stream between said mills and said dam became obstructed with ice, so much so as to stop said mills, and require the channel to be cut out. This obstruction was caused by the defendants' dam stopping the water and ice, and throwing them back upon the said lands and mills of the plaintiffs. Subsequently to the purchase by the defendants, and before the injury complained of, the plaintiffs requested the defendants to remove said dam, and not to cause the water of the river to flow back upon their mills or premises.

Said dam was built at the lower end of said island, and across the part of said river which runs north of said island, one end of the dam abutting on a rock on the island, and from that end a wing dam extends up the river about forty feet along the shore of the island.

At the time the defendants purchased, the wing dam was somewhat out of repair; and afterwards, and before the commencement of this suit, the defendants were proceeding to repair it, and to replace some stones, which the plaintiffs forbade them to do; but the defendants repaired the wing

dam, which before was not sufficient to stop the water; and the dam so repaired was part of the dam that caused the obstructions complained of.

The plaintiffs also claimed, in addition to their ownership of said mills, that they owned the whole island; and they produced in evidence a deed from the proprietors of Claremont to David Dexter, through whom the title to said mills passed, dated February 8, 1813, conveying said island. The sufficiency of this deed was excepted to. They also produced a certified copy of the charter of the town of Claremont. They further produced the records of said proprietors, by which it appeared that on the 26th of March, 1796, they appointed a committee, consisting of five, to sell lands, and fixed upon a form of a deed; that at a meeting on the 8th of June, 1796, they resolved that any three of said committee should make conveyances to purchasers. The deed to Dexter was in the form prescribed, and was executed by three of said committee.

The plaintiffs then introduced evidence tending to show that said Dexter occupied a considerable portion of said island, and so much as he wished, as a mill yard, until his death in 1829, and that the same continued to be so occupied by the heirs of said Dexter and their grantees, without molestation, until the building of the defendants' dam in 1836; and that the occupation has continued since then, up to the commencement of this suit, by the plaintiffs and their grantors, except such portion of the island as is covered by the defendants' pond. The defendants then put in a title in themselves to the land on said river where said dam and cabinet shop stand; said land being bounded " easterly as the river runs;" and they contended:

1st. That being bounded on Sugar River by their title, the true construction of their deed carried them to the middle line of the breadth of said river, which would include a considerable portion of said island, and consequently their dam was upon their own land.

2d. As the plaintiffs showed good title to the island in the purchase of the mills, down as far as their west line, and their

grantors were in possession according to their good title when they took their deed, in 1813, of Rock Island, possession of that part of the island cannot be extended by construction, according to their color of title, to the whole of Rock Island, as contained under their deed of 1813. (The plaintiffs agreed to this position; but it appeared that a part of that portion of the island which the plaintiffs and their grantors occupied, was not included in the former title, and they contended that inasmuch as they had held a part of the island under the deed of 1813, they could hold the remaining part by construction.)

3d. By the true construction of the deed of 1813, the plaintiffs can claim by color of that deed, under the description of " Rock Island," nothing which was covered by the water flowing in the natural channel of the river.

4th. The plaintiffs cannot claim the right to have the water flow away from their mills by *adverse user*, without showing such a use as occasioned actual damage to the defendants, or their grantors; that a use, for any length of time, would not give the right, unless some actual damage were done to the defendants, or their grantors, during that time.

5th. The defendants have the right to use the water power on their own land, if they do not flow the plaintiffs' land, and are not liable for accidental damages occasioned in times of freshet, ice times, &c. The defendants also contended that they could show a verbal license from Wheeler, a previous owner of the plaintiffs' mills, to the defendants' grantor, to erect their dam; and they took the position that after such license it could not be revoked; at least, not without repaying the expenses of the erection.

The plaintiffs contended that such license did not authorize the defendants to repair, as is above stated.

A verdict was taken, by consent, for the plaintiffs, on which judgment was to be entered, or the verdict was to be set aside and a new trial granted, as the opinion of this court should be upon the whole case.

*Perley,* (with whom was *Prentiss,*) for the plaintiffs.

The plaintiffs owned the land on which the mills stood, and on both sides of the north branch, down to a line several rods below, and extending across the island. As low down as this line, their title to the land on both sides was undisputed.

The defendants' dam stopped the water and ice in the stream, and caused them to be thrown back on the plaintiffs' premises, so as to stop their mills.

The wing dam, at the time of the defendants' purchase, had so gone out of repair that it was not sufficient to stop the water. The defendants, though forbidden, repaired and restored the wing dam, which was part of the dam that caused the obstruction. It was, therefore, the repairing and restoring of the dam by the defendants that caused the injury.

I. The plaintiffs owned the land, and were entitled to have the water run through it and from it, in the natural course of the stream. This is a natural right, on which they may well rely without evidence of prescription or user. The owner below has no more right, by obstruction of the stream, to force the water or ice back into the plaintiffs' land above, than he has to drive in his cattle or to enter there himself. *Gilman* v. *Tilton*, 5 N. H. Rep. 232; *Wright* v. *Howard*, 1 Simons and Stuart 190; *Mason* v. *Hill*, 3 Barn. and Adol. 304; *Tyler* v. *Wilkinson*, 4 Mason 397; *Webb* v. *Portland Manufacturing Company*, 3 Sumner 200; *Heath* v. *Williams*, 25 Maine Rep. 209; *Davis* v. *Fuller*, 12 Vermont Rep. 178.

The defendants undertake to justify this injury to the plaintiffs' premises in two ways:

1. Under a license to build a dam in 1836.

2. On the ground that they are not liable for accidental damages " occasioned in times of freshet, ice times, &c."

For the purpose of this case, the license must be understood to have been given as it was offered to be proved.

II. The defendants cannot justify under the license.

1. A license is a mere personal confidence, revocable in its essential nature. What has been done under it before revocation is lawful. But it can authorize no act to be done after revo-

Cowles v. Kidder.

cation. Some authorities go to show that after an erection has been made, a revocation will not impose on the party who has made the erection, the duty of removing it. *Cheever* v. *Pearson*, 16 Pick. 273; 3 Kent's Com. 451, 453; *Prince* v. *Case*, 10 Conn. Rep. 375; 1 Chitty's Practice 338; *Ex parte Coburn*, 1 Cowen 568.

In *Woodbury* v. *Parshley*, 7 N. H. Rep. 237, the license was to build a dam for a temporary purpose, which had not been answered, and no act was done by the defendant after the revocation.

In *Amer. Bridge* v. *Bragg*, 11 N. H. Rep. 102, no question arose as to the effect of a revocation; the question on the plea was, whether a license had been given. No revocation was shown in fact. In *Sampson* v. *Burnside*, 13 N. H. Rep. 264, there was no revocation. There are *dicta* in some of these cases which go beyond the points decided. But the authorities relied on to support these opinions have been questioned and overruled in England. *Sugden on Vendors*, 74, 75; 1 Chitty's Practice 338, 339; *Hewlins* v. *Shipman*, 5 B. & C. 221; *Perry* v. *Fitzhowe*, 8 Adol. and Ellis, N. S. 777; *Fentiman* v. *Smith*, 4 East 109; *Cocker* v. *Cowper*, 1 Crompton, Meeson and Roscoe 418; *Bird* v. *Higginson*, 4 Neville and Manning 505.

And they are controlled by a great weight of authority in this country. *Cook* v. *Stearns*, 11 Mass. 533; *Ruggles* v. *Lesure*, 24 Pick. 187; *Cheever* v. *Pearson*, 16 Pick. 273; *Stevens* v. *Stevens*, 11 Met. 251; *Thompson* v. *Gregory*, 4 Johns. 81; *Mumford* v. *Whitney*, 15 Wend. 380; *Phillips* v. *Thompson*, 1 Johns. Ch. Rep. 145; *Seidensparger* v. *Spear*, 17 Maine Rep. 123; *Prince* v. *Case*, 10 Conn. Rep. 370; *Ex parte Coburn*, 1 Cowen 568; *Bridges* v. *Purcell*, 1 Dev. and Battles (N. C.) Rep. 492.

2. There was nothing in the time or circumstances to make the revocation in this case unreasonable or unconscientious. The dam had been allowed to remain twelve years; the dam had gone out of repair, so as not to stop the water. The defendants' works of course were stopped. The defendants might have well complained if they had been allowed to incur the expense of

repairing their dam and setting their works in operation, and the license had been revoked after that. If the license were ever to be revoked, then was the time.

3. The right here set up is an interest in land, which cannot be conveyed without a deed. It is not a temporary indulgence or privilege, conceded for a particular purpose by one person to another, and depending on a personal contract or confidence. It is the claim of a perpetual right annexed to the defendants' land, and assignable with it, to use the plaintiffs' land by flowing it, into whose-soever hands their land may pass.

It is difficult to understand by what evasive logic the right to flow land forever could be held to imply no interest, when it is perfectly plain that the whole substantial and beneficial interest in the land might be claimed under such a right, and leave nothing but the empty name of owner to the other party. It is believed that the cases, when fairly considered in reference to the statute of frauds, will not warrant the position that such an interest can be conveyed, or in any way created, without deed. In some tribunals there appears to have been formerly a disposition to evade the provisions of that statute, under color of the legal term, *license;* but later and better considered decisions have recalled the law, as in the case of the statute of limitations, to a sounder construction. See the authorities before cited; N. H. Statutes, Ed. of 1830, page 535.

4. But if, upon any unintelligible distinction, the right claimed here can be held not to be an *interest in land*, within the statute of frauds, it is yet an easement, or incorporeal hereditament, and as such, by the common law, lies in grant, and cannot be conveyed without deed. Angell on Watercourses 59, 109 ; 3 Kent's Com. 434, (5th Ed. ;) *Hewlins* v. *Shipman*, 5 B. & C. 221 ; *Bryan* v. *Whittier*, 8 ditto 288.

Shepard's Touchstone 231, is express to the precise point that " license or liberty cannot be created and annexed to an estate of inheritance or freehold without deed."

5. The license was not assignable.

If binding on the original parties, it would not pass to a pur-

chaser, nor charge the land in the hands of the plaintiffs. On this point the authorities are believed to be quite unanimous. 3 Kent's Com. 352; Shepard's Touchstone 231; *Perry* v. *Fitzhowe*, 8 Adol. & El. (N. S.) 777; *Thompson* v. *Gregory*, 4 Johns. 81; *Ex parte Coburn*, 1 Cowen 368; *Prince* v. *Case*, 10 Conn. Rep. 375; *Ruggles* v. *Lesure*, 24 Pick. 187; *Seidensparger* v. *Spear*, 17 Maine Rep. 123; *Harris* v. *Gillingham*, 6 N. H. Rep 11.

6. The license gave no right to repair and restore the dam, especially after the plaintiffs had revoked the license and forbidden the repairs. *Cook* v. *Stearns*, 11 Mass. 533; *Am. Bridge* v. *Bragg*, 11 N. H. Rep. 109; *Stevens* v. *Stevens*, 11 Met. 251.

III. The other position of the defendants is this: " the defendants have a right to use the water-power on their own land, if they do not flow the plaintiffs' land, and are not liable for accidental damages, occasioned in times of freshet, ice times, &c."

1. The claim here advanced is much too loose for the safe foundation of a legal decision. How large a proportion of the year, on Sugar river, and in the climate of New Hampshire, do the defendants propose to cover with "times of freshet, ice times, &c."? How high must the water run, to be termed a "freshet"? How cold and icy must the weather be to constitute an "ice time"? What extent of claim is to be set up under the legal term " &c."?

2. The case does not show any unusual state of the stream or of the weather. The defendants' dam caused the water and ice to be thrown back on the plaintiffs' mills. Any fact on which the defendants rely for their defence must be found by the case. Here was no freshet, no ice time, except such ice times as are usual and habitual in that season of the year. The damage was no more than the natural, necessary, and constant effect of the defendants' dam in a large portion of our year. High water and ice times are known in all our streams, and it is in those times chiefly, and for the most part in those times only, that back water and ice cause damage.

3. The defendants were guilty of gross neglect.

---

Cowles *v.* Kidder.

---

There is no pretence that there was a necessary and inevitable damage, such as may sometimes be suffered by the proprietor below, when a dam above gives way in time of high water, without default of the owner. The defendants had, or ought to have had, waste gates to let off the water. If not, they might have easily removed a part of their dam. The dams were but fifteen rods apart, and the defendants were bound to know of the wrong they were doing.

Besides, these defendants made no use of the water; it was a mere wanton injury done to the plaintiffs, not only without necessity, but without the least advantange to the defendants.

4. But there is no principle of law which authorizes the owner of land below to force the water of a stream back on land above, in any season of the year, or in any stage of the water. He may, doubtless, use the water within his own limits, but cannot force it back beyond; if he do, it is not using his own land but his neighbor's. The cases which hold that the owner below cannot complain if the water is stopped, to make a head by the owner of land above, provided this is done in a reasonable manner, are not at all in point. That right is absolutely necessary, in order to use the water within the owners' limits for mechanical purposes, and can be more easily guarded against abuse. Nor is there any analogy between this and the case of an owner below, who is injured by the giving way of a dam above in an extraordinary rise of water, without default of the owner above. The owner above cannot stop the water to use it on his own land, without detaining it temporarily from the owner below, nor without a dam which may be liable to be carried out by inevitable accident. *Davis* v. *Fuller*, 12 Vermont Rep. 178.

If we are right in these positions, the questions of title to other land, raised on trial, are wholly immaterial to the decision of this cause. The defendants flowed back the water and ice on the plaintiffs' mills, and fail in their defence, both under the license and on the ground of accidental damage.

IV. But the plaintiffs owned the island to the centre of the north branch, by adverse possession.

Cowles *v.* Kidder.

1. The deed of 1813, from the proprietors of Claremont, is a valid deed to convey their title. *Coburn* v. *Ellenwood*, 4 N. H. Rep. 99 ; *Atkinson* v. *Bemis*, 11 N. H. Rep. 44. And whether valid or not, gave color of title to the extent of the boundaries named in the deed, according to the legal construction of the terms used in the description.

2. By the term " island," the land is conveyed to the centre of the two branches which form the island. The same reasons of convenience and utility, which carry a boundary by construction to the centre of a stream in other cases, prevail in this ; and the law has been so decided. *People* v. *Canal Appraisers*, 13 Wend. 370.

3. The plaintiffs and their grantors have held general possession of the island under the deed, using and occupying all parts that they wished, without interruption, till the defendants set up their new pretension in 1848. The entry in 1836, to build the dam by license, was no disturbance or denial of their right, but on the contrary a clear admission. The possession which the defendants' grantors took and kept of the shore of the island, was under the plaintiffs' grantors, and was in law their possession. And this continued till 1848, and of course was the precise spot where the defendants now claim the right to maintain a dam under another title. The plaintiffs and their grantors have entered and held exclusive possession under their deed for thirty-six years ; their deed extends their title to the centre of the stream; this is sufficient evidence of an adverse possession. And the verdict being taken by consent, the possession must be taken to have been adverse. *Lund* v. *Parker*, 4 N. H. Rep. 49 ; *Bailey* v. *Carleton*, 12 N. H. Rep. 15 ; *Jackson* v. *Newton*, 18 Johns. 355 ; *Jackson* v. *Oltz*, 8 Wend. 440 ; *Little* v. *Megquier*, 2 Greenl. Rep. 177 ; *Ken. Pur.* v. *Laboree & al.*, 2 Greenl. Rep. 275 ; *Prescott* v. *Nevers*, 4 Mason Rep. 326 ; *Noyes* v. *Dyer*, 25 Maine Rep. 468.

4. This was no case of mixed possession. The plaintiffs' grantors entered under their deed, which gave them title to the centre of the north branch. They. claimed according to their deed,

that is, to the centre of that branch. Their claim was notorious and exclusive. The defendants did not pass the centre of the north branch to make any claim in the island, till 1848, but entered in 1836, and held from that time till 1848 under the plaintiffs and their grantors. A mixed possession is where two parties are in possession of the same land, *claiming to own it under different titles.* Here the defendants were in possession of part of the land, not claiming to own it under another title, but submitting to the title of the plaintiffs.

V. The defendants' title extends only to the centre of the north branch.

1. Where an island divides a stream into two parts, decidedly unequal, the riparian proprietors own to the centre of the main branch, and the island belongs wholly to the proprietor whose shore is nearest to the island. *Claremont* v. *Carlton,* 2 N. H. Rep. 369; *Greenleaf* v. *Kilton,* 11 N. H. Rep. 530.

But where the island divides the stream into parts so nearly equal that it is doubtful which should be considered as the main branch, evidence may be introduced to show that one of these branches was intended by the term "river," used in a deed. This is a latent ambiguity, not appearing on the face of the deed. 2 N. H. Rep. 369; 11 N. H. Rep. 530.

The case shows such an equal division of the stream by the island in question; and the circumstances are very strong to prove that none of the parties understood that the title of the defendants' grantors extended beyond the thread of the north branch. Down to 1848 they made no claim beyond that line, but admitted the adverse title when they entered the island in 1836. The proprietors of Claremont understood their prior grant to be limited by that line, and conveyed to it by their deed of 1813. Those who have held that title have uniformly claimed the whole island under it.

2. The acts of the parties in a case like this may establish a line different from that to which the terms used in their deeds would *primâ facie* carry them. *Greenleaf* v. *Kilton,* 11 N. H. Rep. 530; *Livingston* v. *Tenbrook,* 16 Johns. 14; *People* v.

*Canal Appraisers*, 13 Wend. 372 ; *Codman* v. *Winslow*, 10 Mass. 149. The circumstances referred to prove such practical construction and location of the land on the north branch.

VI. The defendants show no title to the land bounding them on the river, earlier than the deed of David Atkins & a. to Josiah Stevens, dated Sept. 14th, 1793, recorded August 15th, 1795. It does not appear that the proprietors of Claremont had ever conveyed or assigned by that description.

The proprietors of Claremont owned the land in 1813 ; there was no adverse possession of twenty years, and the title to the island to the centre of the north branch passed by their deed.

VII. On the 10th of May, 1782, John Atkins owned the land of the defendants, and that part of the plaintiffs' on which their mills were built, and on that day conveyed to Timothy Atkins, under whom the plaintiffs claim. In his deed, after describing the land conveyed, he adds a further grant in these terms : " also, all the mills and mill places that of right belongeth to me." The defendants claim under his deed of Sept. 14th, 1793, to Josiah Stevens. The plaintiffs' mills were built and have been maintained under this title from John Atkins. The defendants have no right, in virtue of any conveyance from John Atkins, to disturb this mill place and the mills erected on it. If, by virtue of any general ownership of land, they had such right, they took the land discharged of that right by this grant of John Atkins, who then owned their land. Their " mill place," the site of their mill, was conveyed by his deed, if he owned it.

*Cushing*, (with whom was *Snow*,) for the defendants.

I. It will be seen by the deeds referred to in the case, that the defendants' claim, by title from the proprietors of Claremont, is older than the plaintiffs' deed of Rock Island. The defendants' title is to a tract of land bounded on the river. *Primâ facie*, the owner of the bank of a river owns one half of the land covered by the stream. *Wright* v. *Howard*, 1 Simons and Stuart 191 ; *Crooker* v. *Bragg*, 10 Wendell 260 ; Schultz on Aquatic Rights 119.

There is nothing in this case which tends to rebut the presumption. The deed under which the defendants claim describes their land as bounded by the river, which carries them to the middle line of the river. *Prop. of Claremont* v. *Carleton*, 2 N. H. Rep. 461; *Greenleaf* v. *Kilton*, 11 N. H. Rep. 530; *The State* v. *Gilmanton*, 9 N. H. Rep. 461. To show that an *island* passes in the same way, see *Prop. of Claremont* v. *Carleton*, 2 N. H. Rep. 462. The defendants, then, have a better title than the plaintiffs, and are in possession. The question of adverse possession does not arise.

Further, the plaintiffs' deed purports to convey to them an *island*. It does not purport to convey land bounded on the north branch, but simply the *island*. An *island is land not covered by water*. The case, if we understand it, shows that the defendants' *dam* and pond do not occupy any portion of the island.

II. The plaintiffs cannot claim any easement or right, acquired by user, to have the water flow by the defendants' land without any obstruction by any dam. For in order to this they must show an adverse user. Now the case does not show any interference by the plaintiffs and their grantors with the natural flow of the stream, either by diminishing or increasing its natural flow. The case does not show any adverse user, for which even nominal damages could have been recovered. *Blay* v. *Stenitt*, 2 Watts 327, cited in Crabb's Law of Real Property, 360, note; and the easement, if it ever existed, was *extinguished* by the license which the defendants were prepared to show. *Liggers* v. *Inge*, 7 Bingham 682.

III. The case, then, considered in this point of view, is reduced to the consideration of the rights of owners of mill privileges on the same stream. And the question is, whether the owner of the lower privilege is to be made liable for every accidental damage incidental to the reasonable use of his privilege; or only for such *flowage* as necessarily results from the height and construction of his dam. It is not shown by the case that the height or arrangement of the defendants' dam was such as necessarily to flow the plaintiffs' wheels at any height of the water, but only

Cowles *v.* Kidder.

that at one certain time the *ice* so accumulated about the defendants' dam and in their pond, as to cause the water to flow back, &c., and it was not shown that this was the necessary, or even usual effect of the defendants' dam in the winter. Neither was it shown that the defendants had been guilty of any neglect. The defendants' position is, that they are not liable for any damage incidental to the reasonable use of their privilege. Comyn's Digest, Action on the Case for Nuisance, C.; *Platt* v. *Johnson and Root*, 15 Johns. 218; *Menzies* v. *Bredalbane*, 3 Bligh, N. S. 414, cited Crabb's Law of Real Property, 360, note.

IV. But the defendants further say, that after the license to build their dam at the height to which it was built, they could, in no event, be liable for any such consequences of the erection as were proved—the case not showing any such decay of the dam as would amount to, or authorize a revocation of the license.

WOODS, J. The mills of the plaintiffs were situated on Rock Island, in Sugar River, in Claremont, near the north end of the island, and were erected and used by the grantors of the plaintiffs, for a period of more than twenty years prior to the year 1836; and the mills of the defendants were erected in 1836 by their grantors, and were located about fifteen rods below the plaintiffs' mills. It is not, however, necessary to consider any question of adverse possession arising in the case, nor to settle the questions of construction of the title deeds raised and discussed at the bar. For the purposes of the opinion, the parties may well be regarded as holding the ordinary rights of riparian proprietors. The case will not admit of a view more favorable to the defendants. In December, 1848, the stream between the mills of the plaintiffs, and the dam of the defendants, became obstructed by ice, so much so as to throw back the water upon the land and mills of the plaintiffs, and so as to prevent the operation of the mills. " This obstruction," in the language of the case, " was caused by the defendants' dam stopping the water and ice, and throwing them back." It is quite clear that the plaintiffs, being the owners of the land at the place of their mills,

were entitled to an unobstructed flow through it, and from it. In the language of *Story, J.*, " *Primâ facie*, every proprietor upon each bank of a river is entitled to the land covered with water in front of his bank, to the middle thread of the stream, &c. In virtue of this ownership, he has a right to the use of the water flowing over it, in its natural current, without diminution or obstruction. The consequence of this principle is, that no proprietor has a right to use the water to the prejudice of another. It is wholly immaterial whether the party be a proprietor above or below, in the course of the river, the right being common to all the proprietors *on* the river. No one has a right to diminish the quantity which will, according to the natural current, flow to the proprietor below, or to throw it back upon a proprietor above." *Tyler* v. *Wilkinson*, 4 Mason's Rep. 400. In *Gilman* v. *Tilton*, 5 N. H. Rep. 232, *Richardson C. J.*, says, " In general, every man has a right to the use of the water flowing in a stream through his land ; and if any one divert the water from its natural channel, or throw it back, so as to deprive him of the use of it, the law will give him redress. But one man may acquire, by grant, a right to throw the water back upon the land of another, and long usage may be evidence of such a grant. It is, however, well settled, that a man acquires no such right by merely being the first to make use of the water." The language of Lord *Tenterden*, in *Marow* v. *Hill*, 3 Barn. and Ald. 304, is thus : " Without the consent of the proprietors, who may be affected by his operations, no proprietor can either diminish the quantity of water which would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above." The case of *Davis* v. *Fuller*, 12 Vt. Rep. 178, is much like the present case. By the verdict of the jury, it appeared in that case that the plaintiff owned a certain lot of land, across which flowed a river, on which he had a grist mill. The defendant owned land on the stream below, where he had erected a dam, to carry a saw mill, but had erected it no higher than was necessary for that purpose. This dam occasioned accumulations of ice, which, at times, caused the water to flow back upon the plaintiff's

land, and obstructed his mill, to his injury. In reference to those facts, *Collamer*, *J.*, remarks, "The owner of land has rights to the use of a private stream running over his land, peculiar to him as owner of the land, not derived from occupancy or appropriation, and not common to the whole community. It is the right to the natural flow of the stream. Of this he cannot be deprived by the mere use or appropriation by another." In the case of *Woodman* v. *Tufts*, 9 N. H. Rep. 88, which was case for erecting and continuing a dam across Blackwater river, and overflowing the land of the plaintiff, situated above said dam, the court decided, that if the defendant, without right, maintained a dam so high as to overflow the land of the plaintiff, the presumption of law was that the act was a damage, and no special damage need be shown in order to maintain the action. Upon the doctrine of the authorities cited, we think it is clear that the plaintiffs have sustained a damage by reason of the erection and maintenance of the dam, for which they are entitled to redress, unless, upon the other grounds relied upon, the result may be changed.

The defendants rely upon an alleged license from one Wheeler, a prior owner of the plaintiffs' mills, to the grantors of the defendants, to erect their dam, as a justification of the acts complained of in this case. But that fact, if shown, could furnish no answer to the plaintiffs' action. It is well settled that a parol license, to be exercised upon the land of another, is a mere personal trust and confidence, and is not assignable, and that, although it may be binding as between the parties, it will not pass to a purchaser. It is not an easement, carrying an interest in the land; it is a mere permission to one to do an act, and does not confer an authority upon others to do such act, or exercise the same license. In *Cook* v. *Stearns*, 11 Mass. Rep. 538, it is holden that such a license is countermandable, and that the transferring of the land by the owner to another, or even leasing it without any reservation, would, of itself, be a countermand or revocation of the license. The same doctrine is recognized in *Harris* v. *Gillingham*, 6 N. H. Rep. 9. And in the recent case of *Carleton* v. *Redington*, 1 Foster's Rep. 291, the doctrine is distinctly held,

that such a license is merely a personal privilege, to be enjoyed by the person to whom it is granted, and creates no interest in land, and is not assignable, and that a conveyance by him who exercises the license will confer no right upon another to exercise the same license. The defendants in this case set up claim to no other license than such as they may have derived from their grantors ; to whom, as they allege, the former owners of the plaintiffs' mills gave the license to erect the dam now owned by the defendants, and thereby to throw back the water upon the plaintiffs' land and mills. It is apparent, according to the authorities, that, upon two grounds, the license cannot avail the defendants. In the first place, the conveyance of the mills to the plaintiffs, by those who gave the license, was, of itself, a revocation of the license, and terminated it ; and in the second place, if such were not the effect of that conveyance, still, the license, being a personal privilege, as we have seen, is not assignable, and the conveyance of the dam and other privileges to the defendants, by those to whom the license was granted, did not confer upon them any privilege or right in the license itself, or in its exercise.

There is still another distinct ground—one which, according to the case, was assumed by the plaintiffs at the trial, upon which the license relied on by the defendants must fail to furnish an answer to the plaintiffs' action. At the time of the defendants' purchase, the wing dam had become decayed, and was so out of repair that it was insufficient to stop the water, and the wing dam was afterwards repaired by the defendants, although the plaintiffs forbade the repairs ; and the case specially finds, that the " wing dam so repaired was a part of the dam that caused the obstructions complained of." Now, in the case of *Carleton* v. *Redington,* before referred to, it is distinctly settled that a license to erect a dam and flow the lands of another, terminates with the decay of the dam, and gives no right, when the dam has become decayed and ruinous, to reërect or repair it, and flow the land again. Here is superadded to the decay of the dam, an express revocation of the license to repair, if such

Cowles *v.* Kidder.

license before existed. The act of the defendants in making the repairs was, therefore, clearly unauthorized and wrongful, and the injury to the plaintiffs was the direct and necessary consequence of it. The one was caused by the other.

A further position assumed in the defence, in answer to the right of recovery on the part of the plaintiffs, is, that the defendants have a right to the use of the water on their own lands, if they do not flow the plaintiffs' land, and are not liable for accidental damages occasioned in times of freshet, ice times, &c. The facts reported by the judge who tried this cause, show no such case of accidental damages as is here assumed, and no unusual state of the water, as in the case of a freshet, or an extraordinary ice time. In reference to this subject the case merely finds that the stream between the mills of the plaintiffs and the dam of the defendants "became obstructed with ice, so much so as to stop the mills and require the channel to be cut out." The case, thus far, clearly furnishes no evidence of any sudden and accidental accumulation of ice, by some extraordinary means, or any state of the water which is not usual and ordinary, and always to be expected in certain seasons in each and every year. Accumulations of ice in our streams, in this climate, are as certain as the annual return of winter. Whether, therefore, an accidental accumulation of ice, causing damage to the plaintiffs, would or would not give them a cause of action against the defendants, need not now be determined. Whether the defendants would or would not be answerable for a damage, the result of accident which they could not forsee and prevent, and not being the result or consequence of any wrongful act of their own, we are not called upon to decide. The case before us finds that " the obstruction was caused by the defendants' dam stopping the water and ice, and throwing them back." This was, then, simply the ordinary case of the erection and maintenance of a dam, either higher or otherwise, of a character such as the defendants had no lawful right to maintain, and by means of which the ice and water were accumulated and thrown back upon the mills of the plaintiffs in a manner to occasion a damage. The

idea that the damage resulted from accident is most distinctly negatived by the facts reported in the case. On the other hand, it is distinctly shown to have been caused by the dam, in its necessary and usual operation upon the water, causing the water and ice to be thrown back upon the mills. And we have already seen that the defendants, in this litigation, had no greater rights than those which belong ordinarily to riparian proprietors, and that consequently they had no right to throw back the water upon the lands and mills of the mill owners above, in a manner causing these damages. It has never yet been held, we think, that a riparian proprietor, as such, has the right, by any means, to cause the water in the stream to be thrown back, and to overflow the lands of the proprietor above, upon the stream, to his damage. And we have already seen that where the water is thus thrown back upon and made to overflow the lands of the proprietor above, the law will presume a damage, and it is not necessary in such a case to prove any special damage sustained. *Woodman* v. *Tufts*, before cited.

This ground of defence we regard as being wholly unsustained. The defendants' counsel have called the attention of the court to the case of *China* v. *Southwick*, 3 Fairf. 238, as sustaining this last ground of defence. That action was brought to recover damages for an injury done to the plaintiff's bridge, located at the head of a certain pond, by a head of water raised, as they alleged, by the defendant's dam, at the outlet of the pond. The jury were instructed that if the damage was occasioned by great rains, or by the violence of the wind, the defendant was not liable, provided the jury were also satisfied that the head of water raised by the defendants' dam was not high enough to flow the plaintiff's bridge, or to do damage thereto. A verdict was taken for the defendant. *Weston*, *C. J.*, who delivered the judgment of the court, remarked, that the jury had found that the head of water raised by the defendant's dam was not, at the period complained of, high enough to flow the plaintiff's bridge, or to do damage thereto. Its erection, then, was a lawful act—not in itself calculated to do any injury to the plaintiff. His loss was

occasioned, as the jury have found, by great rains and by the violence of the wind. If the dam had not raised the water to a certain height, the rain or the wind superadded might not have done the damage. It may have been one of a series of causes to which the injury may be indirectly ascribed. It would be carrying the doctrine of liability to an unreasonable length, to run up a succession of causes, and hold each responsible for what followed, especially where the connection was casual and unexpected, as it was here, and where that which was attempted to be charged was in itself innocent. The law gives no encouragement to speculations of this sort. It rejects them at once. Hence the legal maxim, *causa propinqua, non remota spectatur*.

That case was entirely distinguishable from the one under consideration. The erection and maintenance of the dam, in that case, were rightful acts, the same not being of a height to cause the water to flow back upon the bridge, or in any manner to injure it. Moreover, the dam was not found to have been the immediate cause of the injury, but, at most, only a cause remotely connected with the immediate cause of the injury. An extraordinary fall of rain, and the violence of the wind, forcing the water upon the bridge, were the immediate cause of its destruction. That case, then, fell within the principle which has been extensively applied, and to which reference was made in the opinion of the court, already cited.

But in the present case, as we have seen, the erection of the dam of the character of that of the defendants, being of a height and construction calculated to throw back the water of the stream upon the land and the mills of the plaintiffs above, beyond what the water would flow in its natural current, and having that effect, was, itself, an unlawful act, and would render the defendants answerable for any injury resulting from its erection and maintenance. In the case under consideration, the injury sustained by the plaintiffs is found to have been the immediate effect of the wrongful and unlawful act of the defendants; whilst in the case referred to in Maine it was not the result of any illegal or wrongful act of the party attempted to be charged,

nor was any act of his, either rightful or wrongful, the immediate cause of the damage. A case differing so widely from the present in its material facts, can furnish no safe and proper rule for the decision of it. Moreover, the reasoning of the learned chief justice who delivered the opinion of the court, goes far to show that if the dam of the defendant in that case had been the immediate cause of the destruction of the bridge by reason of its erection to an unwarrantable height, amounting to a wrong on the part of the defendant, the defendant would have been answerable for the damage occasioned thereby. There must, therefore, be

*Judgment on the verdict.*