### IN THE

# SUPREME COURT OF THE STATE OF GEORGIA,

# AT DECATUR,

## AUGUST TERM, 1853.

Present—JOSEPH H. LUMPKIN,
   EUGENIUS A. NISBET, } Judges.
   EBENEZER STARNES,

---

No. 1.—John T. Hall, Adm'r of B. C. Brown, dec'd, plaintiff in Error, *vs.* William Boyd and Hugh Campbell, defendants.

[1.] Does the grant of a ferry franchise confer the right to build a bridge at the same place ?  *Query.*

[2.] The Legislature—much less the Inferior Court of a county—cannot appropriate the land of one citizen to the use of another—especially without making provision for compensation.

[3.] A parol license to build a bridge on the land of another, does not authorize the building of a second bridge, when the first has been swept away by a flood.

[4.] If the first bridge was erected under a parol contract—which was executed by one of the parties—Equity would enforce its specific performance ;—but when it is swept away, and the Bill seeks to enforce this contract in reference to another bridge erected at the same place, there must be a distinct allegation that the second bridge was erected under and by virtue of this parol agreement.

In Equity from Meriwether Superior Court. Decided by Judge HILL, February Term, 1853.

This was a bill filed by Bluford C. Brown, when in life, against the defendants, Boyd & Campbell, setting forth the following facts:

That complainant was the owner, by purchase, from one Alexander Hall, of a certain toll bridge over the Flint river, between the counties of Pike and Meriwether; that in 1827, the Legislature had granted a charter to one Turrentine for a ferry near the same place where the bridge now stands; which franchise was constantly used by said Turrentine and his assigns; that the land and the franchise passed through several hands, into those of Hall, who, in 1838, determined to erect a bridge in place of the ferry. It was then discovered, that to build the bridge, it would be necessary to encroach on the land of William Boyd; the abutment of the bridge being about fifteen feet from the ferry landing.

That Hall told Boyd of the facts, and was told by him, "build your bridge: you shall have what land it covers".— Afterwards, a difficulty arising, it was agreed that the bridge might be located on Boyd's land, on condition that persons going to and returning from a certain mill owned by him, might pass free of toll. The bridge was accordingly built, and the agreement carried out by Hall.

The bill further alleged, that, about the time of the completion of the bridge, the Inferior Courts of Meriwether and Pike counties respectively, passed an order establishing it as a toll bridge.

So matters stood until the year 1843, when the bridge failed and had to be re-built.

Hall made a contract with one Williams, by which Williams was to re-build the bridge at the same place, and was permitted to collect the tolls on it for five years, for the purpose of paying himself. Williams constructed the bridge in the space of about a year, and in the mean time Hall re-established the

ferry, and used it for conveying passengers until the completion of the bridge.

The bill stated, that Boyd witnessed the re-building of the bridge without remonstrance or objection: but when it was finished, demanded of Williams, the lessee, to have half of the tolls. Williams and Boyd submitted their dispute to referees, who decided that Boyd should pay one-half of the cost of the Bridge to Williams, and should receive one-half the tolls, which was carried into effect by the parties.

The bill finally charged that Williams' lease had now expired; that Boyd continued to levy tolls at his end of the bridge; and prayed an injunction, &c.

To this Bill a demurrer was filed for want of Equity, and the complainant obtained leave to amend. In the amendment he charged more particularly, that before the commencement of the first bridge, Boyd verbally agreed to let Hall have what land he required for the purpose; relying on which promise, he had gone on to build, and prayed that Boyd might be decreed to convey to complainant the land covered by the bridge.

The amendment further charged, that Powell, to whom Boyd had sold his mills, had claimed and enjoyed the right of having the customers of the mill to pass toll free.

The answer of defendant, Boyd, denied the parol contract to convey the land covered by the bridge; admitted the agreement to permit the use of said land: but asserted that said agreement only related to the first bridge. He denied that he ever agreed to the erection of the second bridge; but charged that he had publicly said that he would not permit the bridge to be re-built as a toll bridge; and was under the impression, while Williams was erecting it, that it was to be free. He denied that he had conveyed to Powell any right of crossing for the customers of the mills; but contended, that that privilege was personal to himself as the owner of the mills, and did not go with the property.

The defendant Campbell, who had leased Boyd's interest in the bridge filed a disclaimer.

Upon the coming in of the amended bill, the same was demurred to, which was sustained by the Court, and the bill, as amended, was dismissed.

To which decision complainant excepts.

O. WARNER, HALL & HALL for plaintiff in error.

STEPHENS & McKINLEY for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

We propose .to examine briefly, each of the grounds upon which the complainant in the bill, vests his right to relief.

[1.] Under the Legislative grant to establish a ferry across the Flint river, on the road leading from Greenville, in Meriwether county, he claims the right to build the bridge which is the subject-matter of this controversy: whether a franchise of ferry confers authority to erect a bridge, it is not necessary to decide. The bill admits, that the bridge is fifteen or twenty feet above the place occupied by the ferry; and that the ferry landing never touched the land of Boyd on which the west end of the bridge stands. Under the grant of *ferry*, therefore, nothing can be claimed for the bridge which has been substituted in its stead.

[2.] Can the complainant rely on the orders of the Inferior Courts of the two counties—bisected by the river at this point—establishing this bridge as a toll bridge? We think not, for the obvious and unanswerable reason, that they provide no compensation to Boyd, whose land has been seized and appropriated, not even for public purposes, but for the private benefit of Hall, the owner of the bridge. The Legislature itself could not exercise the power directly: much less can they delegate it to the Inferior Court of the respective counties of this State.

[3.] Can the claim which the complainant sets up, be sustained on the ground of the *parol license*, to build the *first* bridge?—That bridge was completed in the fall of 1838, and lasted till December, 1843, when it was swept away by a flood. The

present bridge was commenced the year following, and finished in January, 1845. But it is no where averred in the bill, that Boyd ever consented to the erection of this second bridge.— The first bridge being washed away, the party had no right to re-build under the original parol license. 2 *Hilliard on Real Estate, p.* 16.

[4.] It only remains to consider the last ground upon which the title of the complainant's intestate is placed. And here we have had some difficulty. We have hesitated whether to let the bill stand and send the parties to a trial upon it as it is, or to affirm the judgment of the Court below, dismissing the bill, and thereby compel the complainant to file a new bill. The contract set up by the bill and the specific performance of which is prayed for, is to this effect: That about the time the first bridge was built, in September or October 1838, Hall called on Boyd, to obtain a title for the use and occupation of so much of his land as was needed for the western abutment of the bridge. That Boyd agreed to part with the privilege in consideration, that Hall would permit Boyd's customers, to his mill in Pike County, to cross the bridge toll-free. Here then was a contract good and valid in Law, and which Equity would enforce—after Hall had performed his part of it. But as before stated, the bridge thus built, was carried off in December, 1843; and the new one was not erected till January, 1845. And it is no where charged in the bill, that this second bridge was erected, under, and by virtue of the original agreement, as to the first. And this, we apprehend, is a fatal omission.

We have looked closely through the bill, to see if there be any other allegation, upon which an equity would arise, to maintain this proceeding. It charges that during the · interval which elapsed between the destruction of the first bridge and the erection of the second, that the ferry was again brought into use, and that persons crossing at this place, were put over in this way. But it does not allege that the customers to Boyd's mill, were ferried over toll-free, under the

contract entered into between the parties, respecting the bridge. Had this averment been made, it would have connected the erection of the new bridge with the original agreement; and in point of fact, this may be true. It cannot, however, be fairly inferred from the pleadings.

So long as the first bridge stood, the contract was mutually beneficial; and notwithstanding it was *in parol*, it could have been enforced. But the destruction of the first bridge, without fault on the part of Boyd, placed the parties in *statu quo*, and there was neither *part performance*, or any thing else to give jurisdiction to a Court of Chancery.

We find it inadmissable, therefore, to maintain this bill in its present shape. Nor do we deem it advisable to do so, looking alone even to the interest of the complainant. The bill is not sufficiently full as to entitle him to sift the conscience of the defendant, so as to elicit the *whole truth*, touching this transaction.

Judgment affirmed.