The **NORTHWEST PAPER COMPANY,** a Minnesota Corporation, Northwest Paper Company, a Delaware Corporation, and Potlach Forests, Inc., a Delaware Corporation, Petitioners,

v.

**FEDERAL POWER COMMISSION,** Respondent.

No. 17679.

United States Court of Appeals Eighth Circuit.

April 7, 1965.

Vogel, Circuit Judge, dissented.

Josephine H. Klein, Attorney, Federal Power Commission, Washington, D. C.,

made argument. Richard A. Solomon, Gen. Counsel, Federal Power Commission, Howard E. Wahrenbrock, Solicitor, and Joseph B. Hobbs, Atty., Federal Power Commission, Washington, D. C., on the briefs for respondent.

Harry A. Poth, Jr., of Reid & Priest, New York City, made argument. Robert C. Woodbury, New York City, and Peyton G. Bowman, III, Washington, D. C., and Harry C. Applequist and John M. Donovan, Duluth, Minn., on brief for petitioner.

Before VOGEL, MATTHES and RIDGE, Circuit Judges.

MATTHES, Circuit Judge.

This is a proceeding under § 313(b) of the Federal Power Act [Act of June 10, 1920, 41 Stat. 1063, as amended, 16 U.S.C.A. § 825*l*(b)] to review and set aside an order of the Federal Power Commission (Commission) requiring The Northwest Paper Company, a corporation of Minnesota (Paper Company) to apply for a license under the Act for the continued maintenance and operation of its project works in and along the Mississippi River at Brainerd, Minnesota.[1]

On April 15, 1886, Congress enacted a Special Act (Act of April 15, 1886, 24 Stat. 12) providing that:

"the consent of the Government is hereby given to the Mississippi Water-Power and Boom Company of Brainard, Minnesota, to construct across the Mississippi River, at some point not more than two miles from * * * Brainard, to be approved by the Secretary of War, a dam, canal and the appurtenances thereof, for water-power and other purposes, and in connection therewith a wagon and foot bridge for public travel * * *.

"Sec. 2. That the right to alter, amend, or repeal this act is hereby expressly reserved without any claim of any kind arising in favor of any party in consequence of such amendment or repeal."

Pursuant to the Special Act, the permittee, Mississippi Water-Power and Boom Company (Boom Company) constructed a rock-filled, timber-crib dam across the Mississippi River at Brainerd, Minnesota. The project was completed by 1889 at the site of petitioners' existing project. Through mesne conveyances Northern Water Power Company, a Minnesota corporation, acquired the property in 1901. Northern Water Power was acquired by petitioner Paper Company in 1910 and in 1936 the subsidiary conveyed the property to Paper Company.

In 1916 and 1917 Paper Company constructed and completed a paper mill on the east bank of the Mississippi River adjacent to the dam, and, in order to obtain necessary power, reconstructed the dam and installed new generators. The reconstructed dam and generating equipment remained without substantial change until 1950, when a flood severely undercut portions of the dam, portions of the footings eroded, and the gate sections were virtually destroyed. Paper Company procured the approval of the Army Corps of Engineers and of the Division of Waters of the State of Minnesota Department of Conservation for the reconstruction of the project and pursuant to such authority the dam was reconstructed or rebuilt.

Paper Company commenced this proceeding before Commission on April 25, 1963, for a Declaratory Order:

"to remove an uncertainty as to the necessity under the Act for the Paper Company to apply for a license for its Brainerd Project. This uncertainty resulted from the Commission's opinion in Re Public Service Company of New Hampshire, 27 FPC 830, 43 PUR 3d 129 (1962) which contains broad assertions of jurisdiction over all unlicensed hy-

---

1. This proceeding was instituted before the Commission by The Northwest Paper Company and that Company filed this review proceeding. After the cause reached this Court upon motion of Commission and by consent of Paper Company, Northwest Paper Company, a Delaware

dro-electric projects and indications that the Commission might penalize the proprietors of unlicensed projects who failed to make prompt application for a license." [2]

Commission issued its Declaratory Order on December 9, 1963, finding, among other things,

> "The project works authorized and constructed under the special act of 1886 (24 Stat. 12) no longer substantially exist. The project twice has been extensively rebuilt and modified. There are only a few vestiges of the original project works, notably certain oak pilings upon which some of the present structures rest. In our view, it may not be presumed that Congress by the special act of 1886 intended to authorize Mississippi Water-Power and Boom Company or Petitioner to replace the project works with new project works, or to increase or reduce the project's capacity, or otherwise replace or modify the authorized project works.

> "The first major reconstruction and modification was undertaken in 1916 or 1917 to bring the project's capacity up to the demands of Petitioner's new paper plant near the dam site. Apparently, Petitioner does not claim that Northern Power obtained the consent of Congress for this work, as required by sections 9 and 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 401, 403). In any event, when Petitioner com-

menced its construction of project works in 1950, and the installation of new facilities, without having obtained a license pursuant to the provisions of the Federal Power Act, it clearly acted in violation of section 23(b) of that Act.",

and ordered Paper Company to file application for license in accordance with the provisions of the Act.[3]

Upon application of Paper Company, the Commission granted a rehearing for further consideration of the issues raised, and stayed its Declaratory Judgment Order. On March 17, 1964, the Commission issued its opinion No. 421 and order on rehearing affirming its prior Declaratory Order, and directed Paper Company to apply for a license for the Brainerd dam project. The Commission's opinion is reported at 31 FPC 593 and CCH Utilities Law Reports—Federal Report No. 617–9, ¶ 10,446.

The broad question presented to the Commission in the first instance and to us in this review proceeding is whether petitioners are subject to the provisions of the Federal Power Act and are required to procure a license for the continued maintenance and operation of the Brainerd project works.

Sec. 23(b) of the Act, as amended August 26, 1935, 49 Stat. 838 (16 U.S.C.A. § 817), in material part provides that it shall be unlawful for any person for the purpose of developing electric power to construct, operate, or maintain any dam across or in any navigable waters of the United States "except un-

---

corporation, and Potlach Forests, Inc., a Delaware corporation, apparently transferees of Paper Company, were added as parties to this proceeding.

2. The above quote is taken from petitioner's brief.

3. The findings of fact in the quoted part of the order are supported by the record and are not questioned by the petitioners. Additionally, and by way of summary, the record discloses that the original structure consisted of a rock-filled timber crib supported by 14 inch diameter oak pilings

and contained no generating equipment. In 1889–1890 the dam was provided with generating equipment having a capacity of 250 horsepower. In the spring of 1950, after the dam was severely damaged by a flood, the project was "substantially rebuilt and modified" by consolidating the existing rock-filled crib and pile structure in certain areas with pressure pumped concrete to fill voids. At present, a concrete and brick powerhouse, 58 feet by 144 feet, exists housing (1), two pairs of 45 inch, 610 horsepower horizontal water turbines; (2), one pair 32½ inch, 520 horsepower horizontal

der and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this Act." Sec. 23(a) of the Act, as amended 16 U.S.C.A. § 816), provides that "The provisions * * * of this Part shall not be construed as affecting any permit or valid existing right-of-way heretofore granted, * * * or as affecting any authority heretofore given pursuant to law, but any person, * * * corporation * * * holding or possessing such permit, * * * or authority may apply for a license hereunder."

In view of the foregoing exemption provision, resolution of the broad question depends upon the meaning of the Special Act of 1886 pursuant to which the original Brainerd project was constructed. Petitioners' position is that on its face the Special Act constitutes a clear and unambiguous authorization for the continuing operation and maintenance of the Brainerd dam project—i. e., a valid pre-1920 permit for the project works as they now exist; that the Commission erred in holding that the term of the Special Act was limited to the life of the original works; and, as a corollary to the latter, petitioners contend that the power to construct includes the power to repair or rebuild.

Conceding for the purpose of this proceeding that the original congressional grant carried with it the right to maintain any project so constructed, the Commission nevertheless urges that "there is no basis for petitioner's claim of right to maintain the present reconstructed project." Additionally, and in this Court for the first time, the Commission advances the proposition that the congressional consent of 1886 was personal in nature and that "there is no possible

basis for contending that it [Boom Company] could legally transfer or assign its strictly personal rights thereunder." [4]

■ While the petitioners agree that the resolution of the issue posed by the Commission, i. e., "whether applicant holds a valid pre-1920 permit for the project works as they now exist," depends upon the meaning of the Special Act, they assert that the Commission gave such Act a "strained" construction in reaching its "unsupported conclusion." As suggested by petitioners, it is a basic rule of statutory interpretation that in determining its meaning, a statute shall be considered in its entirety, 2 Sutherland, Statutory Construction, 336 § 4703 (3rd Ed. 1943), and that a statute which is clear and unambiguous on its face is not subject to construction. Blair v. City of Chicago, 201 U.S. 400, 26 S.Ct. 427, 50 L.Ed. 801 (1906); Kansas City, Missouri v. Federal Pacific Electric Co., 310 F.2d 271, 273, 274 (8 Cir. 1962), cert. denied 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed. 2d 171 (1962); 2 Sutherland, Statutory Construction, 334 § 4702 (3rd Ed. 1943).

We accept petitioners' premise that there is no ambiguity in the plain and unequivocal words of authorization "That the consent of the Government is hereby given * * * to construct across the Mississippi River * * * a dam, canal and the appurtenances thereof for waterpower and other purposes * * *." But such acceptance does not solve the crucial question whether from such consent to construct a dam, etc., for "waterpower and other purposes" the permittee, Boom Company, or its successors, derived rights of an indefeasible nature—in other words, the right to replace the original project works with other and different

---

water turbines "direct connected" to a 600 kilowatt, 2300 volt generator; (3), and two pairs of 32½ inch, 520 horsepower horizontal water turbines "direct connected" to 900 horsepower 2200 volt synchronous motors used as generators.

4. Petitioners' answer is twofold. First, that the Commission made no findings on this issue, and that we are powerless to

affirm on this basis, citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Second, that the substantive basis for this argument is devoid of merit. We assume for purpose of this opinion, without deciding the question, that the right or permit was transferable.

works in perpetuity, subject only to the limitations contained in the Act.[5]

The uncertainty of the meaning of the Act in this regard justifies, indeed requires, application of the rule that "all federal grants are construed in favor of the Government lest they be enlarged to include more than was expressly included." United States v. Grand River Dam Authority, 363 U.S. 229, 235, 80 S.Ct. 1134, 1138, 4 L.Ed.2d 1186 (1960). See also 3 Sutherland, Statutory Construction, p. 200, § 6402 (3rd Ed. 1943); Charles River Bridge v. Proprietors of Warren Bridge, 11 Pet. 419, 545, 553, 36 U.S. 419, 545–553, 9 L.Ed. 773 (1837); Louisville Bridge Co. v. United States, 242 U.S. 409, 417, 37 S.Ct. 158, 61 L.Ed. 395 (1917); Bridge Co. v. United States, 105 U.S. 470, 480, 26 L.Ed. 1143 (1881); Reichelderfer v. Quinn, 287 U.S. 315, 321, 53 S.Ct. 177, 180, 77 L.Ed. 331 (1932), where the Court stated: "Statutes said to restrict the power of the government by the creation of private rights are, like other public grants, to be strictly construed for the protection of the public interest."

Under petitioners' theory, if the original dam and project were completely destroyed subsequent to the adoption of the Federal Water Power Act of June 10, 1920, it could, under the consent given in the Special Act and without interference by the Commission, reconstruct the dam and project. The deduction to be drawn from this position is that, notwithstanding the enactment of the Federal Water Power Act, Congress intended to and did reserve to itself full authority over the project. We are not so persuaded. The various Acts of Congress forming the background for the Federal Water Power Act of 1920, as amended by the 1935 Act, are indicative not only of an intention to fully develop the water power resources, and to protect the na-

tional interest, but of an intention to centralize the authority over such resources in one Government agency. See River and Harbors Act of 1890 (26 Stat. 426, 453); River and Harbors Act of 1899 (30 Stat. 1121, 1151); General Dam Act of 1906 (34 Stat. 386); Dam Act of 1910 (36 Stat. 593). This intention was recognized by the Supreme Court in First Iowa Hydro-Electric Cooperative v. Federal Power Commission, 328 U.S. 152, 180, 66 S.Ct. 906, 919, 90 L.Ed. 1143 (1946) in this pronouncement: "It [Federal Water Power Act of 1920] was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the *piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted.*" (Emphasis supplied).

The 1920 legislation (Federal Water Power Act) created the Federal Power Commission composed of the Secretary of War, Secretary of Interior, and the Secretary of Agriculture. Under Sec. 23 of that Act the provisions thereof were not to be construed as affecting any permit or valid existing right-of-way theretofore granted. That exemption provision was carried into the 1935 Amendment. See Sec. 23(a) thereof. In the 1935 Amendment, Sec. 23(b) was amended to expressly provide for the first time that "It shall be unlawful * * * for the purpose of developing electric power, to construct, operate, or maintain any dam, * * * or other works * * * across, along, or in any of the navigable waters * * *" except in accordance with a license granted by the Commission or granted prior to June 10, 1920.

---

5. The limitations contained in the Special Act in summary are: 1, The Government may at any time construct a suitable lock for navigation purposes; 2, the Government may at any time take possession of said dam and control the same for purposes of navigation by making proper payment; 3, the Secretary of War may require and enforce modifications and changes in the dam; 4, the dam shall, if necessary, be so built that boats may pass through the same.

■ As we view the history of the water legislation, and having in mind the rule that federal grants are construed in favor of the Government, we are forced to conclude that such legislation was designed to vest in the Commission for the future, the control and jurisdiction which Congress had previously exercised, and that the 1886 grant or permit here under consideration is not susceptible to the interpretation contended for by petitioners. The Commission logically argues, "It is unreasonable to assume, * * * that Congress was delegating to a specialized expert body the obligation of securing comprehensive development of the nation's power resources, while reserving to itself the responsibility of continued surveillance over all locations where any developments had been constructed under previously granted permits."

We have, of course, examined all authorities cited by the parties in support of their positions. Petitioners rely in particular upon City of Newark v. Central Railroad Co. of New Jersey, 267 U.S. 377, 45 S.Ct. 328, 69 L.Ed. 666 (1925) and Rogers Sand Company v. Pittsburgh, Ft. W. & C. Ry. Co., 139 F. 7 (3 Cir. 1905), and insist that they compel a holding that the 1886 Act must be regarded as a valid pre-1920 permit. As contra authority, the Commission cites a number of pre-1886 cases, such as Carleton v. Redington, 21 N.H. 291, 307 (1850); Cowles v. Kidder, 24 N.H. 364 (1852); Hall, Admr. v. Boyd, 14 Ga. 1 (1853). While the cited cases are relevant, we do not, however, regard them as absolutely controlling or dispositive of the question before us.

■ It follows from what has been said, that the Commission properly concluded that the 1886 permit does not authorize the continued maintenance and operation of the Brainerd project without a Commission license.

Accordingly, the Commission's order is affirmed.

VOGEL, Circuit Judge (dissenting).

When Congress passed the Special Act of April 15, 1886, 24 Stat. 12, giving the "consent of the Government" to the construction, "across the Mississippi River, * * * to be approved by the Secretary of War, [of] a dam, canal and the appurtenances thereof, for water-power and other purposes", I believe it did not intend the withholding of its consent to any repair, modernization of or reconstruction of the project. Furthermore, it carefully retained unto itself "the right to alter, amend, or repeal this act * * * without any claim of any kind arising in favor of any party in consequence of such amendment or repeal." The project has been repaired and rebuilt since the passage of the Special Act authorizing it. I believe that any construction of the Special Act to the effect that it did not include repair, upkeep or reconstruction when necessitated by use, by accident, by obsolescence, or by any other means to be entirely unrealistic and unreasonable.

When Congress passed the Federal Water Power Act of June 10, 1920, 41 Stat. 1063, authorizing the Federal Power Commission to issue licenses for construction, operation and maintenance of projects on navigable waters of the United States, it specifically exempted from the terms thereof persons, corporations, etc., holding or possessing a permit or valid existing right-of-way granted prior to June 10, 1920. I believe Congress meant what it said in granting such exemption and that it is not for the Commission or this or any other court to say that, "It is unreasonable to assume, * * * that Congress was delegating to a specialized expert body the obligation of securing comprehensive development of the nation's power resources, while reserving to itself the responsibility of continued surveillance over all locations where any developments had been constructed under previously granted permits." That is exactly what Congress did in providing the exemption and it did so in no uncertain terms.

In the Special Act of 1886, Congress reserved to the Secretary of War the

authority to direct modifications and changes in the original structure whenever he should deem it advisable. The duration of the grant was also specifically controlled by Congress through the power to "alter, amend, or repeal". It seems strange indeed that in enacting the 1920 legislation granting exemptions for permits previously granted, Congress intended the project works erected under those permits to forever remain unchanged or come within the Commission's jurisdiction. Nowhere did Congress say that the term of the Special Act of 1886 was limited to the lifetime of the original works constructed. Congress simply could have vested the Commission with the jurisdiction it seeks in this proceeding. It did not do so.

I would reverse the Commission's order.