**PUENTE de REYNOSA, S. A., Appellant,**
v.
**CITY OF McALLEN, Appellee.**
No. 21936.

United States Court of Appeals
Fifth Circuit.
Feb. 15, 1966.
Rehearing Denied March 16, 1966.

---

1. See footnote 11 in majority opinion.

44

Luther E. Jones, Jr., Corpus Christi, Tex., for appellant.

Robert H. Kern, Jr., and Rankin, Kern, Martinez & De La Garza, McAllen, Tex., for appellee.

Before RIVES, WISDOM and GEWIN, Circuit Judges.

WISDOM, Circuit Judge:

Puente de Reynosa, S. A., plaintiff-appellant, a Mexican corporation, owns

the Mexican end of a Rio Grande River bridge built in 1925 connecting Hidalgo, Texas, with Reynosa, Taumaulipas, Mexico. The City of McAllen, Texas, adjacent to Hidalgo, owns the United States end of the bridge. At the time suit was filed, the City of McAllen was constructing a new bridge, 51 feet downstream, to replace the old bridge. The Mexican bridge company seeks to enjoin construction of the new bridge on the theory that the defendant failed to secure specific congressional consent for the new structure. The plaintiff alleges that the new bridge would divert toll revenues in excess of $10,000. The defendant moved to dismiss the complaint. This the district court treated—properly, we think—as a motion for summary judgment. The Court below, without articulating the reasons for its decision, held that construction of the bridge was authorized by statute and denied injunctive relief to the Mexican corporation. We affirm.

### I.

The major facts are undisputed. Valley Bridge Company, a Texas Corporation, built and operated the American side of the structure under authority of an act Congress approved February 7, 1925.[1] The City of McAllen took title

---

I. 43 Stat. 815 (1925):

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the consent of Congress be, and is hereby, granted to the Valley Bridge Company, a corporation organized under the laws of Texas, to construct, maintain, and operate a bridge and approaches thereto, at a point suitable to the interests of navigation across the Rio Grande near Hidalgo, Texas, in accordance with the provisions of an Act entitled 'An Act to regulate the construction of bridges across navigable waters,' approved March 23, 1906: *Provided,* That the consent of the proper authorities of the Republic of Mexico to the construction, maintenance, and operation of the bridge shall also be obtained.

Sec. 2. The right to alter, amend, or repeal this Act is hereby expressly reserved."

2. Inadequacies of the old bridge justify McAllen's desire for a new bridge. Since

to the American portion of the bridge in 1960. Valley Bridge Company of Reynosa held the initial concession from the Republic of Mexico to construct, own, and operate that portion of the 1925 bridge located on the Mexican side of the International Boundary. The bridge has undergone substantial reconstruction over the past forty years. Puente de Reynosa's concession to operate the bridge on the Mexican side was to expire November 11, 1965. A Mexican federal district court order extending it ten more years is now on appeal to the Supreme Court of Mexico.

Immediately after McAllen took title, the city considered proposals for improving and enlarging or replacing the bridge.[2] By official resolution, July 27, 1961, the City announced that it would construct at the same location a new bridge with the legal owner of the concession on the Mexican side of the river. Shortly thereafter, the City learned that Puente Internacionales, S.A. de C.V. had obtained a concession, October 19, 1960, from the Republic of Mexico to own and operate the Mexican portion of a new bridge, and that Puente de Reynosa's request for a concession for a new bridge had been refused.[3]

---

April 1960 there has been an annual increase in traffic over the bridge of about ten per cent. Traffic congests during peak hours, especially during holiday periods. The vehicular portion of the old bridge accommodates only two lanes of normal traffic. Its 54,000 pound load capacity severely limits its ability to carry a large number of heavy vehicles. The replacement bridge now under construction will be a four-lane concrete structure that will accommodate all traffic anticipated for the foreseeable future.

3. If the Supreme Court of Mexico reverses the Mexican federal district court order extending plaintiff's concession for the old bridge, it appears that the present Mexican franchise would revert to the Mexican government. Defendant concedes that the old bridge probably would be closed after completion of the new facility. R. 19, 23–24.

In July, 1963, after negotiations, the City of McAllen and Puente Internacionales agreed to construct a new toll bridge in virtually the same location as the old bridge. Each party secured separate approval from its own government and entered into a construction contract with its own bridge builder. The City of McAllen applied December 20, 1963, to the United States Corps of Engineers for permission to construct the American portion of the new bridge. The Engineers issued a permit May 7, 1964.[4] The International Boundary and Water Commission approved the City's plans for the new structure March 12. 1964. The City contracted with Harry Newton, Inc. of Graham, Texas, for construction of the United States side of the structure. Puente Internacionales received from the Secretary of Communications and Transports of Mexico its concession for the new bridge October 19, 1960[5] and entered into a contract to construct its portion of the new bridge. Work commenced on that side of the span January 27, 1964. Construction of the City of McAllen's part of the new bridge commenced on schedule July 10, 1964. By the time this appeal was argued in October, 1965, the new bridge was almost ready for operation.

## II.

The City of McAllen contends that: (A) only the United States Government has standing to raise the question whether construction of a bridge across a navigable stream is in violation of a federal statute; (B) Puente de Reynosa has no justiciable interest affected by the City's construction of a replacement bridge; (C) the amount of the plaintiff's claim falls short of the necessary jurisdictional amount.

A. Stated broadly, standing to litigate a "case or controversy" depends on whether the plaintiff's interest, economic or civil, or the public's interest is sufficiently important to justify judicial determination of the controversy.[6] In the case before the Court a federal statute directly affects both substantial economic interests of the litigants and the convenience of the public. In these circumstances we think that the plaintiff has sufficient standing to bring this suit.

B. The plaintiff's justiciable interest in raising the question of statutory violation turns on what substantive rights derive from congressional bridge authorizations. McAllen argues that the 1925 authorization granted franchise rights only to the United States concessionaire for its side of the bridge; that Puente de Reynosa's franchise rights are limited to franchise granted by the Mexican government for the other side of the bridge. The bridge itself is not jointly owned; each party holds a divided interest. The City, therefore, argues that the plaintiff could obtain injunctive relief only if it were operating under a United States permit and had sought to enjoin the City as a competitor from unlawfully operating without such a license.[7]

The determination of franchise rights for an international bridge does not fit tidily into traditional equitable molds. In equity, one American company holding an exclusive franchise for an *intrastate* bridge ordinarily would have a justiciable interest in a suit

---

4. The instrument of approval was approved by the Director of Civil Works for the Chief of Engineers and by the Chief, Office of Civil Functions for the Secretary of the Army. The Corps of Engineers had obtained the Mexican government's approval of the plans in documents transmitted December 5, 1963 by the Director General of Railroads.

5. Puente de Reynosa's application to the Mexican government for a new bridge was finally denied August 24, 1963. The Secretary of Communications and Trans-

ports held that Puente Internacionales' concession had priority.

6. Barrows v. Jackson, 1953, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586; Buchanan v. Warley, 1917, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149. See Wright, Federal Courts 38 (1963).

7. Compare Eagle Pass & Piedras Negras Bridge Co. v. Texas-Coahuila Bridge Co., Tex.Civ.App., 1926, 279 S.W. 937; Tugwell v. Eagle Pass Ferry Co., 1888, 74 Tex. 480, 9 S.W. 120.

against another American company unlawfully operating a competing bridge.[8] And it has been the practice of Congress in authorizing an *interstate* bridge to define in detail the rights of each party in the operation of the span.[9] Congressional definition of rights to *international* bridges necessarily is different since the United States Government has power to control only its side of the boundary. As in the 1925 authorization for the Hidalgo-Reynosa bridge, the sole statutory reference to construction of international bridges is a requirement that permission be obtained from the foreign government before construction of the American portion proceeds.

■■ To find justiciable interest in the international bridge situation, we look beyond the franchise rights expressly granted by statute. Franchise rights, broadly speaking, may involve private property rights or a public interest deemed worthy of protection. See Annot., 90 A.L.R.2d 12–13 (1963). Here the plaintiff claims that its annual profits from the old bridge have been at least $15,000 a year; if the new bridge is completed and put into operation, there will be a sharp reduction in these revenues, with perhaps even a termination of the old facility. A substantial part of the value of its Mexican concession, so the plaintiff's argument goes, would be destroyed by illegal acts of the defendant. In this situation Puente de Reynosa has made a sufficient showing of proprietary interest in the continued operation of the old bridge to satisfy the requirement of a justiciable interest in litigating the

necessity of congressional consent to a new bridge. If new congressional consent was indeed not required, and we hold that it was not, Puente de Reynosa may still have other remedies under common law or statute for the protection of its rights against the City of McAllen. The defendant itself admits that Puente de Reynosa "furthermore could recover in damages from Appellee in the event its rights, if any, are injured or damaged."[10]

■ C. As for the jurisdictional amount, we find it necessary to measure the diminishing value of the plaintiff's franchise rights: the $15,000 a year revenues sought to be protected meet the $10,000 jurisdictional standard. See Seaboard Finance Co. v. Martin, 5 Cir. 1957, 244 F.2d 329, 331; cf. Mississippi & Mo. R. R. Co., v. Ward, 1862, 2 Black (U.S.) 485, 492, 17 L.Ed. 311, 314. The "substantial character of the jurisdictional averment * * * is to be tested, not by the mere immediate pecuniary damage resulting from the acts complained of, but by the value of the business to be protected and the rights of property which the complainant sought to have recognized and enforced." Bitterman v. Louisville & Nashville R. R., 1907, 207 U.S. 205, 222, 28 S.Ct. 91, 98, 52 L.Ed. 171, 183.

### III.

The crux of the plaintiff's case on the merits is the contention that construction of the new bridge without express congressional consent is a violation of Section 9 of the Rivers and Harbors Act of 1899.[11] We find that, in the circumstances, construction of a *replacement*

---

8. See cases cited note 7 supra.

9. See, e. g., Act Creating the Arkansas-Mississippi Bridge Commission, May 17, 1939, ch. 139, 53 Stat. 747.

10. Brief for Appellee, p. 21.

11. 33 U.S.C. § 401:
"It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the build-

ing of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: *Provided*, That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construc-

bridge does not violate this statute. We attach great weight to the Corps of Engineers' approval of the structure as a *replacement* for the old bridge. The United States Corps of Engineers is the only agency Congress has authorized to make such a determination.

■ We must examine the statutory pattern Congress has developed to authorize construction of bridges. The Supreme Court early established that the power to regulate commerce gives Congress exclusive jurisdiction over interstate or international bridges over navigable waters. See Covington & Cincinnati Bridge Co. v. Commonwealth of Kentucky, 1894, 154 U.S. 204, 14 S.Ct. 1087, 38 L.Ed. 962. Section 9 of the Rivers and Harbors Act of 1899 makes it unlawful to construct a bridge over any navigable river without consent of Congress. Hubbard v. Fort, 3 Cir. 1911, 188 F. 987. The Bridge Act of 1906 [12] sets out in detail the conditions and procedure for construction of any bridges that Congress might authorize after March 23,

1906. Every subsequent act authorizing a new international bridge, including the 1925 Act involved in this case, incorporates by reference the provisions of the 1906 Act. The dominant element of the 1906 Act is the vesting of broad discretionary authority in the Army Corps of Engineers for the construction and maintenance of specific bridges Congress has approved. The Corps of Engineers granted the permit for the Hidalgo-Reynosa *replacement* bridge under the 1925 Congressional authorization for a bridge at that location.

The basic procedure for approval of plans for bridges is set out in Section 1 of the 1906 Act.[13] Under this provision, once Congress has authorized "persons to construct and maintain a bridge" covered by the Act, the bridge shall not be built until the Army Corps of Engineers has "approved * * * plans and specifications and the location of such bridge and accessory works." And it is unlawful to deviate from the approved plans, *"either before or after completion of the*

tion is commenced: *And provided further*, That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army. Mar. 3, 1899, c. 425, § 9, 30 Stat. 1151."

12. 33 U.S.C. §§ 491–498. In 1940 Congress passed additional legislation authorizing the Secretary of the Army to order alteration, reconstruction, or relocation of a previously approved bridge for unreasonable obstruction to navigation or any other purpose. 33 U.S.C. §§ 511–524. However, this statute, especially its provision for United States contribution to the cost of relocation, was designed more for relocation to a new site rather than replacement of a previous structure on essential the same site, e. g., railroad or highway bridge relocation because of change in route. In any event, it is unnecessary for us to reach the relocation provisions to support the Army's approval of the new bridge in this case.

13. 33 U.S.C. § 491:
"When, after March 23, 1906, authority is granted by Congress to any persons to construct and maintain a bridge across or over any of the navigable waters of the United States, such bridge shall not be built or commenced until the plans and specifications for its construction, together with such drawings of the proposed construction and such map of the proposed location as may be required for a full understanding of the subject, have been submitted to the Secretary of the Army and Chief of Engineers for their approval, nor until they shall have approved such plans and specifications and the location of such bridge and accessory works; and when the plans for any bridge to be constructed under the provisions of sections 491–498 of this title, have been approved by the Chief of Engineers and by the Secretary of the Army it shall not be lawful to deviate from such plans, either before or after completion of the structure, unless the modification of such plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army. Mar. 23, 1906, c. 1130, § 1, 34 Stat. 84."

*structure,* unless the modification of such plans" has received the approval of the Secretary of the Army and Chief of Engineers. The primary interests of Congress have been the protection of navigation,[14] the reasonableness of tolls,[15] and more recently, flood control [16] and similar projects.

The Army "Instrument of Approval" authorizing construction of the new Hidalgo-Reynosa bridge makes clear that the Department considers it "as a replacement" for the old structure under the original Congressional authorization of 1925. The instrument states that the approval is made in exercise of the Corps of Engineers' authority under the Bridge Act of 1906 to approve the modification of existing bridges. Although the instrument cites no specific section of the 1906 Act, the language is a paraphrase of that provision vesting the Corps with general authority to pass upon all modifications of bridges "before or after completion." [17]

The Army's approval of the new Hidalgo-Reynosa bridge is in accord with regulations promulgated by the Corps of Engineers for this purpose. These regulations state that a bridge cannot lawfully be constructed across an international waterway until congressional authority has been obtained and the plans have been approved by the Corps of Engineers and the Secretary of the Army. 33 C.F.R. § 209.120(a) (1) and (2) (1962). The instrument of approval for the replacement of the Hidalgo-Reynosa bridge explicitly stated, though without discussion, that the new structure falls within the authority of congressional consent to the old bridge at that location. Under the Corps' own regulations, the

Army could not have given its approval unless it considered it had sufficient legislative authority. The regulations also provide for a notice, and if necessary, a hearing on each application for bridge construction. 33 C.F.R. § 209.120(b) (3) (1962). The Army's records for this bridge show that the Corps of Engineers February 12, 1964 posted a public notice of the City of McAllen's application for construction of the new bridge, allowing one month for protests. Since there were no formal objections, the Corps of Engineers, in accordance with the regulations, dispensed with formal hearing on the application. It seems clear, therefore, that the Corps meticulously followed its standard published procedures for approval of the new Hidalgo-Reynosa structure.

We conclude that the Army reached a justifiable result in its finding that a replacement bridge at the Hidalgo-Reynosa location was lawful within the original congressional authority of 1925. We hold that construction and maintenance of the replacement Hidalo-Reynosa bridge, following United States Army approval under the Bridge Act of 1906 and 1925 authorization for a structure at this location, does not violate 33 U.S.C. § 401. Congressional consent for the "construction, operation and maintenance" of "a bridge" at a particular location and constitutes sufficient authority for a replacement bridge at essentially the same location as a "modification" under Section 1 of the 1906 Act. The major congressional interests in approval of international bridges, as we have said, are protection of navigation and reasonableness of tolls. Congress has delegated primary responsibility to

---

14. 33 U.S.C. § 494; H.R.Rep. No. 182, 59th Cong., 1st Sess. (1906).

15. 33 U.S.C. § 503.

16. 33 U.S.C. § 701.

17. The letter of transmittal expressly states the limited scope of the permit: "The inclosed [sic] instrument should not be considered as an approval of the design features of any structure au-

thorized or an implication that such structure is considered adequate for the purpose intended. A Department of the Army instrument merely expresses the assent of the Federal Government to the proposed work insofar as the public rights of navigation are concerned and does not authorize any injury to private property or invasion of private rights, or any infringement of Federal, State or local laws or regulations."

the Corps of Engineers for the execution of these objectives. The Corps will have exactly the same authority over the Hidalgo-Reynosa replacement bridge as it had over the old one. The purposes of Congress will not be violated by the new bridge.[18] The record indicates that the replacement bridge will facilitate commerce between the United States and Mexico at the Hidalgo-Reynosa crossing. We do not state a general rule as to the distance a replacement bridge must be from the old structure to qualify under the original congressional authorization. Nor do we make a judgment as to the status of the replacement bridge, if it had not received the Army's approval. Cf. Northwest Paper Co. v. Federal Power Commission, 8 Cir. 1965, 344 F.2d 47. And we make no judgment as to the effect of the alleged violation of plaintiff's franchise rights apart from the necessity of congressional consent.[19] We hold only that in the circumstances of this case, construction of a replacement bridge 51.3 feet away from the standing bridge does not make the replacement bridge illegal under 33 U.S.C. § 401.

This result is supported by a strikingly similar case in the Third Circuit decided just one year before the Bridge Act of 1906. In Rogers Sand Co. v. Pittsburgh, Ft. Wayne & Chicago Ry., 3 Cir. 1905, 139 F. 7, the owner of a steamboat brought a libel for damages sustained when his vessel struck pilings and piers of a railway's new bridge on the Allegheny River. The new bridge had been constructed 50 feet from the one originally authorized by Congress. Libelant claimed, among other things, that the new bridge was illegal since congressional consent required by the Rivers and Harbors Act of 1899 had not been obtained. The court rejected this claim.

A replacement of the old, inadequate bridge fell within the railroad's "right to maintain the bridge, and from the duty imposed by law * * * to keep its bridges at all times safe, and to adequately provide for the convenience of the public."[20]

Although the court held the 1899 Act inapplicable to the rebuilding of a bridge lawfully in existence when the act was passed, it stressed the fact that the new bridge was constructed under a permit from the War Department. The 1899 Act clearly covers the Hidalgo-Reynosa bridge. But the Third Circuit's conclusion of a right to replace the bridge, based upon the original authorization, still applies to this case. And of course, the new bridge does have the express Army approval required by the 1899 Act.

## IV.

■ Finally, the defendant urges, in the alternative, that federal statutes relating to bridges do not apply to this case, because the Rio Grande is not "navigable" at Hidalgo. This argument rests on the so-called "navigable in fact" test of The Daniel Ball, 1871, 10 Wall. (U.S.) 557, 563, 19 L.Ed. 999, a test the Supreme Court has continuously eroded in application of 33 U.S.C. § 401. See Economy Light & Power Co. v. United States, 1921, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847. Under present law, as we read it, evidence of prior actual navigable capacity raises a presumption that potential navigability may be restored "after reasonable improvements."

■ The plaintiff's uncontested affidavits and general historical references indicate that high-pressure steamboats made frequent trips up the Rio Grande during the last part of the nineteenth century. Although the parties agree that

18. The scanty legislative history indicates that congressional interest in individual authorizations lies primarily in fixing the initial, general "location" of a bridge, while leaving the specific location to the Corps of Engineers. See H.R.Rep. No. 182, 59th Cong., 1st Sess. 2 (1906).

19. Cf. permit letter cited note 17 supra.

20. 139 F. at 8. Compare duty of City of McAllen under 1925 Act "to construct, *maintain, and operate* a bridge and approaches thereto, at a point suitable to the interests of navigation across the Rio Grande near Hidalgo, Texas. * * *" (Emphasis added.)

significant commercial traffic on this part of the river stopped about 1900, the Corps of Engineers found that small boats continue to be navigated on the river. Defendant concedes that ferrying and minor fishing activities still are carried out. The Supreme Court repeatedly has sustained a conclusion of navigability on this kind of evidence, noting that "use of a stream long abandoned by water commerce is difficult to prove by abundant evidence." United States v. Appalachian Electric Power Co., 1940, 311 U.S. 377, 416, 61 S.Ct. 291, 303, 85 L.Ed. 243, 257. In these circumstances, under 33 U.S.C. § 401, we hold that the record shows that the Rio Grande River at the Hidalgo-Reynosa Bridge comes within the definition of "navigable waters".

This Court affirms the judgment of the District Court.