**UNITED STATES of America,**
**Plaintiff,**

v.

**W. Langston HOLLAND, Individually,**
**et al., Defendants.**

**No. 73–623 Civ. T–K.**

United States District Court,
M. D. Florida,
Tampa Division.

March 15, 1974.

Final Decree March 27, 1974.

Anthony J. LaSpada, Asst. U. S. Atty., Tampa, Fla., John Vance Hughes, Gen. Atty., U. S. Environmental Protection Agency Region IV, Atlanta, Ga., for plaintiff.

Alan C. Sundberg, St. Petersburg, Fla., for Geo. F. Young, Inc.

Thomas A. Clark and John W. Boult, of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for all other defendants.

## MEMORANDUM OPINION

KRENTZMAN, District Judge.

This is an action brought by the United States to enjoin allegedly unlawful landfilling operations in an area known as Harbor Isle, adjoining Papy's Bayou, St. Petersburg, Florida. The government contends that the defendants have begun filling the waters of the bayou with sand, dirt, dredged spoil and biological materials without the permits required by 33 U.S.C. §§ 403, 407 and 1311(a). For relief the government requests a stoppage of further filling and a restoration of some mangrove wetland.

A hearing was held on December 21, 1973, to consider the government's motion for a temporary restraining order. After considering the evidence and argument of both parties the motion was granted. On December 26th the temporary restraining order was extended in full force pending further hearings.

On January 9, 1974, plaintiff's motion for preliminary injunction was heard. At that proceeding the following were established to the Court's satisfaction:

1. Defendants are engaged in developing a 281 acre tract of land known as Harbor Isle.

2. For the purposes of the preliminary injunction hearing the Court accepted defendants' determination that the mean high water line is one foot above sea level.

3. Tide data, visual observation and classification of vegetation established that a substantial number of tides exceed two feet above sea level.

(a) The United States Geological Survey tide gauge data indicated that 50–100 tides exceed two feet in the subject waters each year.

4. The parties stipulated to the accuracy of a land survey introduced by defendants. The survey and other evidence established that:

(a) Most of the property is interlaced with artificial mosquito canals containing water.

(b) The water in the mosquito canals is connected to Papy's Bayou.

(c) The elevation of much of the property is less than two feet.

5. Without a permit issued under authority of Title 33, United States Code, Sections 407 and 1344, defendants have discharged sand, dirt, dredged spoil and biological materials into the man-made canals and into mangrove wetlands which are periodically inundated by tides exceeding two feet above sea level.

6. Defendants would continue to discharge sand, dirt, dredged spoil and biological materials until the fill created has effectively displaced tidal waters, thereby eliminating the normal ebb and flow of tides over the subject property.

7. Continued discharge would result in irreparable injury. ss and damage

to the aquatic ecosystem of Papy's Bayou and to the commercial and sport fisheries which are dependent upon the estuaries of the Gulf of Mexico.

The Court felt these facts established acts of sufficient scope to warrant federal jurisdiction under the Federal Water Pollution Control Act, and of sufficient magnitude to justify a preliminary injunction. The motion for such an injunction was granted at the hearing. A brief order of injunction and findings was signed January 11, 1974.

Since the courts have not yet been faced with the question of whether federal jurisdiction over water pollution encompasses intertidal wetlands by virtue of the relatively new Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 et seq., this opinion will offer the rationale for the grant of jurisdiction.

### The Federal Water Pollution Control Act Amendments of 1972

The government charged the defendants with past and continuing violations of Section 301(a) of the Federal Water Pollution Control Act Amendments of 1972 (FWPCA).[1] To sustain this allegation two showings had to be made. First it had to be established that the defendants' acts were such as to be prohibited if done in waters within federal jurisdiction, and second, that the waters receiving the impact of the prohibited conduct were indeed within that jurisdictional ambit.

### Prohibited Activities

■ The FWPCA is an admirably comprehensive piece of legislation. It was designed to deal with all facets of recapturing and preserving the biological integrity of the nation's water by creating a web of complex interrelated regulatory programs. Section 301(a), the enforcement hub of the statute, however, is stated very simply. It provides that except as otherwise permitted with-

in the Act "the discharge of any pollutant by any person shall be unlawful."[2] The plainness of the prohibition is matched by the breadth given the definition of a "discharge of a pollutant":

(A) Any addition of any pollutant to navigable waters from any point source,

(B) Any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source . . . other than a vessel or other floating craft. 33 U.S.C. § 1362(12)

"Pollutant" is in turn defined as

. . . *Dredged spoil*, solid waste, incinerator residue, sewage, garbage, sewer sludge, munitions, chemical wastes, *biological materials*, radioactive materials, heat, wrecked or discarded equipment, rock, *sand*, cellar dirt and *industrial*, municipal, and agricultural waste discharged into water. . . . Id. § 1362(6) (emphasis added)

And "point source" is

. . . any discernible, confined and discrete conveyance, *including* but not limited to any *pipe, ditch*, channel, tunnel, conduit, well, discrete fissure, container, *rolling stock*, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. *Id.* § 1362(14) (emphasis added)

The evidence substantiates the defendants' admission that without a permit they have discharged and would continue to discharge from point sources, including dump trucks, drag lines, and bulldozers, materials defined as pollutants. Whether these pollutants were discharged into waters within federal jurisdiction was the key issue.

### Jurisdiction under the FWPCA

Throughout the course of this litigation there has been considerable discussion about whether the mosquito ditches that connect with Papy's Bayou are "navigable" and much testimony about

---

1. 33 U.S.C. §§ 1151–1160.

2. *Id.* § 1311(a).

whether certain discharges of pollutants were above or below the "mean high water line." Argument was heard on the issue of whether federal jurisdiction under the FWPCA was limited to activities taking place in navigable waters below the mean high water line. Because the terms "navigability" and "mean high water line" have played such important parts in determining federal jurisdiction over water pollution in the past, the contention that these terms should be used in arguing jurisdiction under the FWPCA was not surprising.

For years the mainstays of the federal water pollution effort were Sections 10 and 13 of Rivers and Harbors Act of 1899.[3] Section 10 makes it illegal to fill, excavate, alter or modify the course, condition or capacity of waters within the boundaries of a navigable waterway without authorization from the Corps of Engineers. Section 13 prohibits the deposit of refuse in, or on the bank of, a navigable waterway without a Corps of Engineers' permit. Both of these laws are by their terms limited to waters that are deemed navigable. Because of this limitation past discussion of federal jurisdiction over water pollution was largely a question of the navigability of the waterway being affected.

Why the Congress limited the Rivers and Harbors Act to navigable waters is no insoluble mystery. Although the Constitution does not mention navigable waters, it vests in Congress the power to "regulate commerce with foreign nations and among the several states."[4] Since much of the interstate commerce of the 19th century was water borne, it was early held that the commerce power necessarily included the power to regulate navigation. Gibbons v. Ogden, 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23 (1824). *See also* Hall v. DeCuir, 95 U.S. 485, 24 L. Ed. 547 (1977); Veazie v. Moor, 14 How. 568, 55 U.S. 568, 14 L.Ed. 545 (1852); Norris v. City of Boston, 48 U. S. (7 How.) 282 (1849). To make this control effective Congress was deemed empowered to keep navigable waters open and free and to provide sanctions for interference. *See, e. g.,* Gilman v. Philadelphia, 3 Wall. 713, 70 U.S. 713, 18 L.Ed. 96 (1865). The Rivers and Harbors Act of 1899 was an exercise of that power.

Whether Congressional power in 1899 was limited by judicial interpretation to navigable waters is now only of historical significance. At the time of the Act's passage, "commerce" was still nearly synonymous with "transportation"[5] and the term "interstate" was largely used in a geographical sense.[6] The extant case law relied upon the tenth amendment as a restraint upon the federal commerce power. The effects intrastate activity might have on commerce outside the state was of little concern. *See* Oliver Iron v. Lord, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929 (1923); Hammer v. Dagenhart, 247 U. S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918).

Although the reach of federal power under the commerce clause widened dramatically in the twentieth century, the nineteenth century legacy of "navigation" lingered to limit federal control over water pollution. Since Congress had clearly limited the Rivers and Harbors Act to navigation, any subsequent judicial broadening of jurisdiction under the statute of necessity had to be in the

---

3. 33 U.S.C. §§ 403, 407.

4. U.S.Const. art. I, § 3.

5. *See* United States v. E. C. Knight, 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895). *See also* Schechter Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699 (1925); James Clark Dist. Co. v. Western Md. Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (1915); Internat'l Textbook v. Pigg, 217 U. S. 91, 30 S.Ct. 481, 54 L.Ed. 678 (1910).

6. *See, e. g.,* Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936); United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936); Oliver Iron v. Lord, 262 U.S. 172, 45 S.Ct. 526, 67 L.Ed. 929 (1923); Hanley v. Kansas City Ry., 187 U.S. 617, 23 S.Ct. 214, 47 L.Ed. 333 (1903).

form of expanding the definition of "navigability."

Starting with the basic definition of waters that

> . . . form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water. (The Daniel Ball, 10 Wall. 557, 77 U.S. 557, 19 L.Ed. 999 (1870).

the test of navigability was enlarged in 1874 to embrace waters that had the capability of commercial use, not merely those in actual use.[7] The definition was again expanded in 1921 to bring in waterbodies whose past history of commercial use made it navigable despite subsequent physical or economic changes preventing present use for commerce.[8] In 1940 it was held that a waterway would be deemed navigable-in-fact if by "reasonable improvements" it could be made navigable.[9] Thus the jurisdictional basis broadened until only the most insignificant body of water could escape one of the tests of navigability.

But the limitation of navigability still worked to impede efforts to forestall the degradation of the aquatic environment. Not only did small feeder streams and tributaries remain exempt from federal jurisdiction but, more importantly, the wetland areas adjoining the waterways did also.[10]

Just as it was not surprising that Congress limited the Rivers and Harbors Act to navigable waters, it was not surprising to have limited enforcement under the statute to navigation-impeding activities taking place *in* the water. Those charged with enforcing the Act needed an easily discernible boundary for their jurisdictional power—*i. e.* the lateral extent of the waterbody. In tidal areas that boundary became the mean high water line.

### The Mean High Water Line

Since the Rivers and Harbors Act was passed at a time when interstate commerce was thought of in a geographical sense, and since the Act was designed primarily to keep the navigable waters free of physical impediments, it was natural to draw on the property-law concept of the mean high water line to limit the scope of jurisdiction in tidal water areas. If an agency is responsible only for keeping a waterbody free of obstructions, there is little need to focus attention on activities beyond the ordinary reach of the water.

But because the mean high water line was, and is, used to demarcate authority in tidal zones does not necessarily mean that the line is. an inviolate barrier to federal assumption of authority over activities landward of the line. Examining the history and use of the line underscores the point.

At common law the ordinary high tide marked the boundary between private and sovereign lands.[11] In Attorney General v. Chambers, 4 De G. M. & G. 206 (1854), Lord Chancellor Cranworth, citing Lord Hale's treatise De Jure Maris, rejected the ordinary high water line in favor of the line formed by the medium high tide between the spring and neap tides. The court decided that the upland owner should be entitled to so much of

7. The Montello, 20 Wall. 430, 441–442, 87 U.S. 430, 22 L.Ed. 391 (1974).

8. Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921).

9. United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); See, e. g., Puente de Reynosa, S.A. v. City of McAllen, 357 F.2d 43 (5 Cir. 1966); United States v. Underwood, 344 F. Supp. 486 (M.D.Fla.1972).

10. *See, e. g.*, United States v. Cannon, 363 F.Supp. 1045 (D.Del.1973); Hoyer, Corps of Engineers Dredge and Fill Jurisdiction: Buttressing a Citadel Under Siege, 26 U. Fla.L.Rev. 19 (1973).

11. *See generally* F. Maloney, S. Player & F. Baldwin, Water Law and Administration: The Florida Experience 67 (1968); Gay, The High Water Mark: Boundary Between Public and Private Lands, 18 U.Fla.L.Rev. 553 (1966).

the land as is "for the most part of the year dry and maniorable." *Id.* at 214–15.

The United States Supreme Court in Borax Consolidated, Ltd. v. Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935), cited Chambers when it adopted the similar "mean high water" line as the limit of a federal land grant. *Borax* became a landmark case in the law of tidal boundaries. And even though the test used by the Supreme Court was enunciated to settle a land dispute, and notwithstanding the fact that the test derived from an English court's desire to preserve to property owners so much of the land as is "dry and maniorable", the test of the mean high water mark became the inveterate standard to be applied in limiting federal authority over navigable waters. Courts were justified in relying on a rule of common law which did no harm to the purposes of the statutes in question. The need to protect the navigable capacity of a waterway above the mean high water line was obviously minimal.

If the instant case involved only the question of federal jurisdiction over non-navigable streams and wetland areas under the Rivers and Harbors Act the Court might be compelled to deny jurisdiction by the sheer weight of precedent. But such is not the case. Here the Court is presented with a dispute brought pursuant to a new federal law not limited to the traditional tests of navigability.

On October 18, 1972, the Congress exercised its power under the commerce clause by enacting the FWPCA, establishing regulatory programs to combat pollution of the nation's waters. Even though it seems certain that Congress sought to broaden federal jurisdiction under the Act, it did so in a manner that appears calculated to force courts to engage in verbal acrobatics. Although using the term "navigable waters" in the prohibitory phase of the statute, the definition of "navigable waters" is stated to be "waters of the United States, including the territorial seas." 33 U.S. C. § 1362(7). The definition stands with no limiting language.

If indeed the Congress saw fit to define away the navigability restriction, the sole limitation on the reach of federal power remaining would be the commerce clause. Thus two questions emerge. Did Congress intend to define away the old "navigability" restriction? And does the Congress have such power?

The answer to the first question is in the affirmative. The Court is of the opinion that the clear meaning of the statutory definition may be ascertained on its face without having to rely on the well established judicial philosophy that "forbids a narrow, cramped reading" of water pollution legislation. United States v. Ashland Oil and Transportation Co., 364 F.Supp. 349, 350 (W. D.Ky.1973). *See* United States v. Standard Oil Co., 384 U.S. 224, 226 (1966); United States v. Republic Steel Corp., 362 U.S. 482, 491 (1960). The legislative history of the FWPCA supports this clear meaning.

The bill submitted to the Senate as S. 2770 defined "navigable waters" to mean "navigable waters of the *United States,* portions thereof, and the tributaries thereof, including the territorial seas and the Great Lakes." Legislative History of the Water Pollution Control Act Amendments of 1972, Vol. 2, p. 1698 (hereinafter cited as "Legislative History"). The report of the Senate Committee on Public Works submitted with S. 2770 explained the definition:

The control strategy of the Act extends to navigable waters. The definition of this term means the navigable waters of the United States, portions thereof, tributaries thereof, and includes the territorial seas and the Great Lakes. Through narrow interpretation of the definition of interstate waters the implementation (of the) 1965 Act was severely limited. Water moves in hydrologic cycles and *it is essential that discharge of pollu-*

*tants be controlled at the source.* Therefore, reference to the control requirements must be made to the navigable waters, portions thereof, and their tributaries. Legislative History, Vol. 2, p. 1495. (emphasis added)

The House of Representatives bill, H.R. 11896, contained a more restrictive definition: "The navigable waters of the United States, including the territorial seas." Legislative History, Vol. 1, p. 1069. Significantly, when the two bills went to the Committee of Conference, the word "navigable" was deleted from the House definition in creating the final standard. The reason for this change was stated in the Joint Explanatory Statement of the Committee of Conference:

"The conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes." Conference Report, Senate Report No. 92–1236, Sept. 28, 1972, page 144, U.S.Code Cong. & Admin. News 1972, p. 3822; Reprinted in Legislative History, Vol. 1, p. 327.

In presenting the Conference version to the House, Representative Dingell, a member of the Conference Committee, explained the Committee's intention on jurisdiction:

"The Conference bill defined the term 'navigable waters' broadly for water quality purposes. (502(7)). It means 'all the waters of the United States' in a geographic sense. It does not mean 'navigable waters of the United States' in the technical sense as we sometimes see in some laws." Legislative History, Vol. 1, p. 250.

After a brief discussion of Court cases in which the judiciary has forced some expansion of the old navigability test for water quality purposes, Representative Dingell concluded:

"Thus, this new definition clearly encompasses all water bodies, including main streams and their tributaries, for water quality purposes. No longer are the old, narrow definitions of navigability, as determined by the Corps of Engineers, going to govern matters covered by this bill. *Id.*"

The foregoing compels the Court to conclude that the former test of navigability was indeed defined away in the FWPCA. The Court in United States v. Ashland Oil and Transportation Co., 364 F.Supp. 349 (W.D.Ky.1973) reached the same conclusion when faced with a criminal prosecution brought under the Act. In *Ashland* the Government charged the defendant under Section 311(b)(5) for failing to notify the appropriate federal agency after gaining knowledge that it had discharged oil into a non-navigable stream. The defendant argued that the FWPCA applies only to classical navigable waters of the United States and that therefore the notification requirements of the FWPCA did not apply to the discharge. Chief Judge Gordon disagreed with defendant's interpretation, stating:

"To determine the clear meaning of the questioned criminal provision, one need go no further than the definitions provided in the Act. Congress defined 'navigable waters' as 'waters of the United States.' [33 U.S.C. § 1362(7)]. To determine whether an oil discharge has entered waters regulated by Section 311 of the Act, a citizen simply inserts the statutory definition in place of the term 'navigable waters.' That navigable waters is sometimes followed by a prepositional phrase does not alter this obvious result except perhaps to emphasize the inclusion of the waters of all the geographic areas listed in the definition of 'United States.' [Section 311(b) (5) of the Act; 33 U.S.C. Section 1321 (b)(5)." *Id.* 364 F.Supp. at 350.

\* \* \* \* \* \*

"Navigability is not an element of this offense as it is excluded from the Act by definition. 33 U.S.C. § 1362(7)" *Id.* 364 F.Supp. at 351.

This Court agrees.

Clearly Congress has the power to eliminate the "navigability" limitation from the reach of federal control under the Commerce Clause. The "geographic" and "transportation" conception of the Commerce Clause which may have placed the navigation restriction in the Rivers and Harbors Act of 1899 has long since been abandoned in defining federal power. Now when courts are forced with a challenge to congressional power under the Commerce Clause a statute's validity is upheld by determining first, if the general activity sought to be regulated is reasonably related to, or has an effect on, interstate commerce and, second, whether the specific activities in the case before the court are those intended to be reached by Congress through the statute. Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1970); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

█ It is beyond question that water pollution has a serious effect on interstate commerce and that the Congress has the power to regulate activities such as dredging and filling which cause such pollution. As stated by the Court in Zabel v. Tabb, 430 F.2d 199, 203 (5 Cir. 1970):

"[T]he nation knows, if the Courts do not, that the destruction of fish and wildlife in our estuarine waters does have a substantial effect on interstate commerce. . . Nor is it challenged that dredge and fill projects are activities which may tend to destroy the ecological balance and thereby affect commerce substantially."

█ Congress and the courts have become aware of the lethal effect pollution has on all organisims. Weakening any of the life support systems bodes disaster for the rest of the interrelated life forms.[12] To recognize this and yet hold that pollution does not affect interstate commerce unless committed in navigable waters below the mean high water line would be contrary to reason. Congress is not limited by the "navigable waters" test in its authority to control pollution under the Commerce Clause.

Having thus ascertained that Congress had the power to go beyond the "navigability" limitation in its control over water pollution and that it intended to do so in the FWPCA, the question remains whether the Congress intended to reach the type of activities involved in the instant case—the pollution of non-navigable mosquito canals and mangrove wetland areas.

As previously noted the defendants without a permit have filled and otherwise polluted various mosquito canals which connected with the waters of Papy's Bayou. The manmade canals were found to be non-navigable for the purposes of this action.

█ The conclusion that Congress intended to reach water-bodies such as these canals with the FWPCA is inescapable. The legislative history quoted *supra* manifests a clear intent to break from the limitations of the Rivers and Harbors Act to get at the sources of pollution. Polluting canals that empty into a bayou arm of Tampa Bay is clearly an activity Congress sought to regulate.[13] The fact that these canals were manmade makes no difference. They were constructed long before the development scheme was conceived. That the defendants used them to convey the pollutants without a permit is the matter of importance.

█ The Court is of the opinion that the waters of the mosquito canals were within definition of "waters of the Unit-

---

12. *See* Little, New Attitudes about Legal Protection for Remains of Florida's Natural Environment, 23 U.Fla.L.Rev. 459, 462 (1971).

13. United States v. Ashland Oil and Transportation Co., *supra.*

ed States" and that the filling of them without a permit was a violation of the FWPCA.

■ Whether the FWPCA was meant to reach activities such as those committed here in mangrove wetlands above the mean high water line is slightly less apparent. An examination of Congressional intent, however, leads this Court to the conclusion that such intertidal wetlands were indeed meant to be covered.

The first glimpse of Congressional intent comes from the FWPCA itself. Section 101(a) puts forth the purpose of the Act:

"The objective of this Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this Act—

(1) It is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

(2) It is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in

and on the water be achieved by July 1, 1983." 33 U.S.C. § 1251(a).

In Section 102(c) the Administrator of the Environmental Protection Agency is authorized to make grants for basin studies to provide comprehensive water quality control plans for a basin. "Basin" in that section is defined to include "rivers and their tributaries, streams, coastal waters, sounds, estuaries, bays, lakes, and portions thereof, as well as the lands drained thereby." 33 U.S.C. § 1252(c).

Section 404 of the Act establishes a program for permitting the discharge of dredged or fill materials into waters of the United States. Subsection (c) provides for careful consideration of whether or not such discharges will have "unacceptable adverse effect on municipal water supplies, shellfish beds, and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c).

These three sections do not by themselves prove conclusively that Congress sought to assume jurisdiction over activities taking place in wetlands above the mean high water line. What these sections do reveal is a sensitivity to the value of a coastal breeding ground.[14]

14. An ancillary statement of intent is found in the Coastal Zone Management Act of 1972, 16 U.S.C. § 1451 which articulated the intent of Congress to preserve and protect the resources of the Coastal Zone.

The term "coastal zone" is defined as:

" . . . the coastal waters (including the lands therein and thereunder) and the adjacent shorelines (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of the several coastal states, and includes *transitional* and *intertidal areas, salt marshes, wetlands* and beaches. . . . The zone extends inland from the shorelines only to the extent necessary to control shorelines, the use of which have a direct and significant impact on the coastal waters. . . ."
16 U.S.C. 1453(a). (emphasis added).

In Section 302 of the Act, Congress made the following findings:

"(a) There is a *national interest* in the effective management, beneficial use, *protec-*

tion, and *development* of the coastal zone;

(b) The coastal zone is rich in a variety of . . . resources of immediate and potential value to the present and future *well-being of the Nation*;

(c) The *increasing* and competing *demands* upon the lands and *waters* of our coastal zone occasioned by . . . economic development, including requirements for . . . *residential developments* . . . have resulted in the loss of living, marine resources, wildlife, *nutrient-rich areas, permanent and adverse changes to ecological systems.* . . . ;

(d) *The coastal zone* . . . [*is*] *ecologically fragile* and *extremely vulnerable to destruction* by *man's alteration*;

(e) Important *ecological* . . . *values* in the coastal zone which are *essential* to the well-being of *all citizens* are being *irretrievably damaged or lost*;

\*     \*     \*     \*     \*

Composed of various interdependent ecological systems (*i. e.* marshes, mudflats, shallow open water, mud and sand bottoms, beach and dunes) the delicately balanced coastal environment is highly sensitive to human activities within its confines. *See* Cooper, Ecological Considerations, Coastal Zone Management 129 (J. Hite & J. Stepp ed.1971)

Congress realizes the coastal ecology is endangered by poorly planned development. It cannot be gainsaid that the discharge of pollutants into coastal, estuarine and adjacent waters have caused considerable damage to the marine environment. Estuaries, partially enclosed bodies of water within which there is a measurable dilution of sea water by fresh-water run off, and other breeding zones have suffered the most damage. Salt water marshes and other wetlands constitute a major component of the estuarine system.

Estuaries are not only highly productive in organic matter, but also are valuable in replenishing oxygen for the atmosphere. *See* Teclaff, The Coastal Zone—Control over Encroachments into the Tidewaters, 2 Environ.L.Rev. 618 (1971). Moreover, estuaries are vital to fish and shellfish. About two-thirds of all ocean animals either spend a part of their life there or feed upon a species that has lived there. The First Annual Report of the Council on Environmental Quality, 176 (1970). The FWPCA embodies the realization that pollution of these areas may be ecologically fatal.

In an attempt to combat these threats to the coastal environment, the Congress broadened its jurisdiction to encompass "all waters of the United States." In doing so Congress deemed it "essential that the discharge of pollutants be controlled *at the source.*" Legislative History Vol. 2, p. 1495. Getting at the source of pollution is going beyond the confines of a high water line. It cannot be doubted that most of the damage to marine life results from land-based and not sea-based activities.

■ One of the sources of pollution in the instant case was the discharge of sand, dirt and dredged spoil on land which, although above the mean high water line, was periodically innundated with the waters of Papy's Bayou. Defendants argue that such activities are beyond the reach of the FWPCA. This Court does not agree. Even the occasional lapping of the bayou waters has conveyed these pollutants into the waters of the United States. That the pollutants are not so conveyed every day is of no consequence. Pollutants have been introduced into the waters of the United States without a permit and the mean high water mark cannot be used to create a barrier behind which such activi-

(h) The key to more effective protection and use of . . . water resources . . . is to encourage the states . . . by assisting the states, in cooperation with Federal and local governments . . . in developing . . . water use programs for the coastal zone. . . ." 16 U.S.C. § 1451 (emphasis added)

Based on those findings Congress declared in Section 303 it is the national policy . . .

"(a) to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations. . . ." 16 U.S.C. § 1452

The Coastal Zone Act establishes Federal grant programs to aid the States in developing and administering management agencies which would have the authority to ensure the wise use of land and water resources in the coastal zone. That this Act is in support and concert with the FWPCA is shown by Section 307(f) of the Coastal Zone Act which provides that the requirements established in the FWPCA or established pursuant to FWPCA will be incorporated as the water pollution control requirements in the water use programs to be developed by the States :

"Notwithstanding any other provision of this title, nothing in this title shall in any-way affect any requirement (1) established by the Federal Water Pollution Control Act, as amended. . . . or (2) established by the Federal Government . . . pursuant to such Acts. Such requirements shall be incorporated in any program developed pursuant to this title and shall be the water pollution control . . . requirements applicable to such program." 16 U.S.C. § 1456(f)

ties can be excused. The environment cannot afford such safety zones.

■ The Court is of the opinion that the mean high water line is no limit to federal authority under the FWPCA. While the line remains a valid demarcation for other purposes, it has no rational connection to the aquatic ecosystems which the FWPCA is intended to protect. Congress has wisely determined that federal authority over water pollution properly rests on the Commerce Clause and not on past interpretations of an act designed to protect navigation. And the Commerce Clause gives Congress ample authority to reach activities above the mean high water line that pollute the waters of the United States.

■ The defendants' filling activities on land periodically innundated by tidal waters constituted discharges entering "waters of the United States" and, since done without a permit, were thus in violation of 33 U.S.C. § 1311(a).

*The Rivers and Harbors Act of 1899*

Plaintiff has alleged violations of Sections 10 and 13 of the Rivers and Harbors Act of 1899 (33 U.S.C. §§ 403, 407). The evidence indicated that refuse or fill material has been deposited into navigable waters below the mean high water line. The area below the line is a small percentage of the total area for which an injunction is sought.

The government argued that any activity above mean high water which affects the quality of classical navigable-in-law waters may be properly enjoined as a violation of the 1899 Act. Plaintiff also contended that artificial mosquito canals are navigable-in-law when connected to navigable-in-fact water-bodies since the canals contain water at mean high tide.

Although these arguments are not unpersuasive, the Court's foregoing determination that the FWPCA encompasses the area included in the government's allegation under the 1899 Act makes it unnecessary to decide whether the theories based on the older statute are meritorious.

By determining that the defendants have violated the provisions of the FWPCA and by enjoining further unlawful activities, the Court has not permanently prohibited defendants from going forward with their plans. All the Court has said is that the activities cannot be continued without a federal permit.

The Court realizes that the thought of preserving huge stretches of coastline in a natural state and forbidding all commercial development in coastal areas is unrealistic. This is a societal choice which the government must observe. But the government can and should insure that the public interest in protecting all life forms is at least considered in the development plans. Any expense that might be incurred by this evaluative process will be dwarfed by the cost of neglecting the ecological interests.

FINAL DECREE

This cause having come before this Court for final disposition pursuant to a stipulation and joint motion by the Government and all Defendants herein for Consent Decree, and this Court being fully advised in the premises, it is hereby, ordered and adjudged as follows:

1. Jurisdiction is founded upon Section 1319(b), Title 33, United States Code.

2. Defendants reside and conduct business within the Middle District of Florida.

3. The activities upon which this action is based were conducted on property known as Harbor Island Development on Papy's Bayou, St. Petersburg, Pinellas County, Florida, the boundary lines of which are shown on the attached Survey Plat No. 14021A by George F. Young, Inc. Revision dated February 1, 1974. (Omitted from published opinion.)

4. On the property described hereinabove, defendants have discharged pollutants into waters of the United States in ·

violation of Section 1311(a), Title 33, United States Code.

5. Defendants shall perform all work necessary to allow establishment of 78.6 acres as mangrove preserve areas consistent with proper environmental planning, preservation, restoration, and ecological considerations. The mangrove preserve areas referred to are colored green and striped with dark parallel lines on the survey plat attached hereto. Defendants shall commence to create said preserve areas within 30 days from the date of this Decree, and shall complete all necessary contouring and debris removal in those areas within three months from the date of this Decree. The dikes withholding tide waters from the preserve areas shall then be removed after consultation with and the approval of the United States Environmental Protection Agency and the United States Army Corps of Engineers.

6. A twenty-five foot buffer zone having a gentle slope no greater than one foot vertical rise to four feet horizontal shall fringe all mangrove preserve areas, except those areas which are separated from retention ponds by an earthen berm or dike.

7. The mangrove preserve areas shall remain as natural environmental areas in perpetuity. Defendant shall take the necessary legal precautions to insure that the mangrove preserve areas are properly protected from lawful destruction by present and future owners of this property.

8. Should construction activities necessitate the discharge of water from any retention pond, defendants shall insure that total suspended solids shall not exceed concentrations of 30 parts per million as a "daily average," nor shall total suspended solids exceed concentrations of 50 parts per million as a "daily maximum."

Defendants shall measure total suspended solids concentrations at the point of discharge on at least one day in every two week period. Sample analysis shall be in compliance with methods of analysis specified in 40 CFR § 136.3, 38 Fed. Register 28759. Any violation of the effluent limitations provided in his paragraph shall be reported immediately to the Director of Enforcement Division, United States Environmental Protection Agency, 1421 Peachtree Street, N.E., Atlanta, Georgia 30309.

The "daily average" concentration means the arithmetic average (weighed by flow) of all the daily determinations of concentrations made during a calendar month. Daily determinations of concentration made using a composite sample shall be the concentration of the composite sample. When grab samples are used, the daily determination of concentration shall be the arithmetic average (weighed by flow value) of all the samples collected during that calendar day.

The "daily maximum" concentration means the daily determination of concentration for any calendar day.

9. Within 30 days from the date of this Decree defendants shall apply to the appropriate Federal agency or agencies for any necessary permits for contemplated discharge during construction activities and shall meet the conditions outlined in paragraph 8, until such permits are issued or denied.

10. The temporary restraining order heretofore entered by this Court on December 21, 1973, and the preliminary injunction heretofore entered by this Court on January 11, 1974, are hereby dissolved.

11. Defendants are hereby authorized and permitted, from this date forward, to proceed with development activities on the property described hereinabove in any manner not inconsistent with the terms of this Final Decree. This Decree shall not be interpreted to affect, excuse, relieve, or modify any legal obligation of the defendants to comply with any requirements validly imposed by any applicable Federal or State laws or any local ordinances.

12. The provisions of this Decree shall apply to and be binding upon the

parties to this action, their officers, agents, servants, employees, successors, and assigns, and upon all those in active concert or participation with those who receive actual notice of this Decree by personal service or otherwise.

13. Jurisdiction is retained for the purpose of enabling any party to this Decree to apply to this Court at any time for such further orders and directions as may be necessary for the construction or carrying out of this Decree, or for the modification or termination of any of the provisions herein, or for the enforcement of compliance herewith.